T.C. Memo. 2020-67

UNITED STATES TAX COURT

ROLAND J. THOMA AND DONNA M. THOMA, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 21922-15.                    Filed May 27, 2020.

Roland J. Thoma and Donna M. Thoma, for themselves.

Alexander R. Roche and Mayer Y. Silber, for respondent.

CONTENTS

FINDINGS OF FACT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

1.   General background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

2.   Mr. Thoma's work for Thoma & Hjerpe and biweekly payments for his
     accounting services . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

3.   Mr. Thoma's sale of his interest in Thoma & Hjerpe and quarterly
     installment payments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

**[*2]**

4. Thoma & Hjerpe's SIMPLE IRA plan and Mr. Thoma's contributions to his SIMPLE IRA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

5. Mr. Thoma and Mr. Hjerpe's falling out; Mr. Thoma's professional licensing authority complaint; Mr. Thoma's lawsuit for remaining quarterly installment payments; Mr. Thoma's unemployment benefits claim . . . . . . 34

6. Tax reporting . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

   a. 2010 return . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

   b. 2011 return . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

7. Notice of deficiency . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

OPINION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

I. Mr. Thoma's self-employment-tax liability for 2010 and 2011 . . . . . . . . 56

   A. The parties' positions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

   B. Analysis: partnership and partner. . . . . . . . . . . . . . . . . . . . . . . . . . 64

      1. Agreement governing Thoma & Hjerpe and conduct in executing its terms. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

      2. Contributions to Thoma & Hjerpe . . . . . . . . . . . . . . . . . . . 67

      3. Control over income and capital of Thoma & Hjerpe and right to make withdrawals . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

      4. Interest in net profits of Thoma & Hjerpe and obligation to share losses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

      5. Whether Thoma & Hjerpe was conducted in the joint names of Mr. Thoma and Mr. Hjerpe . . . . . . . . . . . . . . . . . . . . . . . . . 70

**[\*3]**      6.      Thoma & Hjerpe federal tax returns; representation of joint venture . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

7.      Separate books for Thoma & Hjerpe. . . . . . . . . . . . . . . . . . . . 72

8.      Mutual control of, and responsibilities over, Thoma & Hjerpe . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

C.      Analysis:  employee or independent contractor . . . . . . . . . . . . . . . . 74

II.      Mr. Thoma's business expenses. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80

A.      Mr. Thoma's expenses of working for Thoma & Hjerpe are deductible only as employee-business expenses. . . . . . . . . . . . . . . 83

B.      The deductible amounts of Mr. Thoma's expenses of working for Thoma & Hjerpe are those determined in the notice of deficiency. . 83

III.      Mr. Thoma's health insurance expenses . . . . . . . . . . . . . . . . . . . . . . . . . . . 87

IV.      Mr. Thoma's SIMPLE IRA contributions . . . . . . . . . . . . . . . . . . . . . . . . . . 88

V.      Quarterly installment payments during 2011 for the sale of Mr. Thoma's interest in Thoma & Hjerpe . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90

VI.      Accuracy-related penalties. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 95

A.      Underpayment of tax for 2010. . . . . . . . . . . . . . . . . . . . . . . . . . 97

B.      Underpayment of tax for 2011. . . . . . . . . . . . . . . . . . . . . . . . . . 98

C.      Reasonable cause . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99

1.      Treatment of Mr. Thoma as a partner of Thoma & Hjerpe. . 100

2.      Mr. Thoma's unsubstantiated business expenses . . . . . . . . . 102

**[\*4]**   3.   Gross profit percentage of 84.34% for 2011. . . . . . . . . . . . . 103

MEMORANDUM FINDINGS OF FACT AND OPINION

MORRISON, <u>Judge</u>:  The petitioners, Roland J. Thoma and Donna M. Thoma, filed joint income-tax returns for 2010 and 2011.  On June 4, 2015, the respondent (hereinafter, the "IRS") issued a notice of deficiency to Mr. and Ms. Thoma determining income-tax deficiencies and accuracy-related penalties under section 6662(a), for tax years 2010 and 2011, as shown below.[1]

|       |            | Penalty      |
| Year  | Deficiency | sec. 6662(a) |
| ----- | ---------- | ------------ |
| 2010  | $3,249     | $650         |
| 2011  | 14,660     | 2,932        |

Mr. and Ms. Thoma filed a timely petition for redetermination of the income-tax deficiencies and accuracy-related penalties for both years under section 6213(a).  We have jurisdiction under section 6214(a).[2]

---

[1]Unless otherwise indicated, all section numbers refer to sections of the Internal Revenue Code of 1986, as amended and in effect at all relevant times, and all Rule numbers refer to the Tax Court Rules of Practice and Procedure.  All dollar amounts are rounded to the nearest dollar.

[2]Mr. and Ms. Thoma resided in Illinois when they filed their petition.  Therefore, an appeal of our decision in this case would go to the U.S. Court of

(continued...)

**[*5]**   There are six issues for decision.  The issues and our holdings are summarized below.

1.  <u>Self-employment-tax liability and deduction for one-half of self-employment tax</u>.  The accounting firm of Thoma & Hjerpe paid Mr. Thoma for accounting services rendered in 2010 and 2011.  These biweekly payments totaled $69,156 in 2010 and $63,299 in 2011.  On their tax returns for 2010 and 2011 Mr. and Ms. Thoma took the position that Mr. Thoma was self-employed and that the biweekly payments constituted self-employment income for each year, such that Mr. Thoma was liable for self-employment tax.  They also claimed an income-tax deduction for one-half of the self-employment tax they reported for Mr. Thoma for each year.  The notice of deficiency determined that Mr. Thoma was not self-employed, but rather an employee.  The notice of deficiency recharacterized the reported self-employment income as wages.  It accordingly reduced self-employment income for each year to zero, reduced self-employment tax for each year to zero, and reduced the income-tax deduction for one-half of self-employment tax for each year to zero.  We agree that Mr. Thoma was an employee

²(...continued)
Appeals for the Seventh Circuit, <u>see</u> sec. 7482(b)(1), unless the parties designate the Court of Appeals for another circuit (except the Federal Circuit), <u>see</u> sec. 7482(b)(2).

[*6] and sustain the self-employment tax and one-half of self-employment tax deduction adjustments in the notice of deficiency. See infra part I, pp. 56-80.

2. Self-employed business-expense deductions. On their tax returns for 2010 and 2011 Mr. and Ms. Thoma claimed deductions of $7,396 and $20,867, respectively, for business expenses Mr. Thoma paid in rendering accounting services for Thoma & Hjerpe. They reported these deductions as affecting adjusted gross income ("AGI"),[3] which is consistent with the deductions being categorized under section 62(a)(1) as attributable to a taxpayer's business other than the business of providing services as an employee. The notice of deficiency determined that Mr. Thoma was an employee of Thoma & Hjerpe in 2010 and 2011, such that the expenses were not governed by section 62(a)(1) and not deductible in arriving at AGI. The notice of deficiency determined that Mr. Thoma's expenses of working for Thoma & Hjerpe were deductible only as unreimbursed-employee-business expenses under section 67(b). That deduction is a subset of the miscellaneous itemized deductions allowed under section 67(b). Under section 67(a), total miscellaneous itemized deductions are allowed only to the extent they exceed 2% of AGI. The notice of deficiency determined that the

---

[3]Deductions affecting AGI are also known as above-the-line deductions. See infra p. 81.

[*7] business expenses were deductible as miscellaneous itemized deductions in the reduced amounts of $7,288 for 2010 and $14,406 for 2011, before application of the 2% of AGI floor. We sustain the determination that the business expenses are deductible only as unreimbursed-employee-business expenses. See infra part II.A, p. 83. We also sustain the determination that the deductible amounts of Mr. Thoma's expenses of working for Thoma & Hjerpe are $7,288 for 2010 and $14,406 for 2011, before application of the 2% of AGI floor, as determined in the notice of deficiency. See infra part II.B, pp. 83-87.

   3. Self-employed health insurance expense deductions. On their tax returns for 2010 and 2011 Mr. and Ms. Thoma claimed self-employed health insurance expense deductions under section 162(l). Section 162(l) allows self-employed taxpayers a deduction for the cost of "insurance which constitutes medical care", i.e., the cost of health insurance. Mr. and Ms. Thoma reported that Mr. Thoma paid health insurance expenses of $4,648 for 2010 and $5,580 for 2011. The notice of deficiency determined that Mr. Thoma was an employee of Thoma & Hjerpe and that the health insurance expenses were not properly deductible under section 162(l), but only as deductions for medical expenses under section 213(a). Section 213(a) allows a deduction for medical expenses, including health insurance expenses, but subject to a 7.5% of AGI floor. We sustain the

**[\*8]** determination regarding the tax treatment of Mr. Thoma's health insurance expenses. See infra part III, pp. 87-88.

4. Self-employed SIMPLE IRA contribution deductions. Mr. Thoma directly contributed $15,711 to his SIMPLE IRA in 2010 and $14,000 in 2011. Mr. and Ms. Thoma claimed deductions for those contributions. The notice of deficiency determined that the contributions were not deductible because Mr. Thoma was an employee of Thoma & Hjerpe. We sustain the determination that Mr. Thoma was an employee and sustain the disallowance of the SIMPLE IRA contribution deductions. See infra part IV, pp. 88-89.

5. Recovery of basis and character of 2011 installment sale payments. In 2008 Mr. Thoma sold his interest in Thoma & Hjerpe to Mr. Hjerpe. In 2011 he received installment sale payments from Mr. Hjerpe totaling $160,000. On their 2011 tax return Mr. and Ms. Thoma reported that the $160,000 installment sale payments were composed of $131,637 in long-term capital gain, $3,921 in taxable interest, and $24,442 in tax-free recovery of basis. The notice of deficiency determined that the installment sale payments were instead composed of $134,001 in long-term capital gain, $19,700 in taxable interest, and $6,299 in tax-free recovery of basis. We consider Mr. and Ms. Thoma to have eventually conceded that this determination is correct. Therefore, we sustain the determination

[*9] regarding the recovery of basis and character of the 2011 installment sale payments.  See infra part V, pp. 90-94.

6.  Accuracy-related penalties.  The notice of deficiency determined that Mr. and Ms. Thoma were liable for accuracy-related penalties under section 6662(a) for 2010 and 2011.  We sustain that determination.  See infra part VI, pp. 95-104.

FINDINGS OF FACT

Some facts are stipulated, and they are so found.

During the years at issue Mr. Thoma worked as a certified public accountant and Ms. Thoma worked as a secretary.

1.  General background

On October 1, 1976, Mr. Thoma purchased a partial ownership interest in an accounting firm for $40,000.  He worked as an accountant at the accounting firm.[4] At some point after October 1, 1976, but before August 2005, Mr. Thoma became the sole owner of the accounting firm, and he began operating the firm as a sole proprietorship under the name "Thoma & Associates, CPAs".

Around January 1, 2006, Mr. Thoma went into business with Eric Hjerpe, another accountant.  Their accounting business appears to have absorbed Mr.

---

[4]At some point in his career and seemingly before 1976, Mr. Thoma was an IRS revenue agent.

[*10] Thoma's sole proprietorship. Their business also appears to have initially operated under the name of Mr. Thoma's former sole proprietorship, Thoma & Associates, CPAs, but by 2007, it was operating under the name Thoma & Hjerpe, CPAs. We refer to Mr. Thoma's and Mr. Hjerpe's accounting firm business as Thoma & Hjerpe.

Mr. Thoma and Mr. Hjerpe executed two contracts for their business. The first contract was executed in August 2005, with a stated effective date of January 1, 2006. The second contract was executed on January 28, 2010, and according to its recitals, "restated" the 2005 agreement.

The 2005 agreement provided as follows:

PARTNERSHIP AGREEMENT

1. Introduction. Agreement to form a Partnership made on August 1, 2005, between Roland J. Thoma, residing at Bloomington, Illinois, and Eric Hjerpe, residing at Normal, Illinois.

2. Partnership Purpose and Name. The parties agree to form a partnership, on the terms set out below, to engage in the business of public accounting. The partnership's name shall be Thoma & Associates, CPAs and its principal office shall be at 2425 E. Lincoln, Bloomington, Illinois.

3. Duration of Partnership. The Partnership will begin on January 1, 2006 and will continue in this form until January 1, 2008, when it will change in accordance with this Agreement. The partnership will then continue until it terminates in accordance with the provisions of this Agreement.

[*11]       4. <u>Partners' Capital Contributions</u>.  The partnership capital shall be contributed by Roland J. Thoma, partly in cash, partly in personal property, and partly in the form of the current work-in-process of Thoma & Associates, a sole proprietorship.  Until January 1, 2008, Thoma shall be sole general partner, and Hjerpe's interest in the partnership shall be limited to income established by agreement under this document or by further agreement of the parties.  Effective January 1, 2008, Hjerpe shall become the sole general partner and Thoma's interest in the partnership will be as defined in paragraphs 7 and 12 below.

5. <u>Thoma's Capital Accounts</u>.  Until January 1, 2008, only Thoma shall have a capital account.  After January 1, 2008, both Thoma and Hjerpe will have a capital account.

6. <u>Division of Profits and Losses</u>.  Until January 1, 2008, Thoma shall be entitled to all of the net profits and losses of the partnership, and Hjerpe shall receive gross compensation of $100,000.00 annually.  "Gross compensation" shall be defined as: "All guaranteed payments, continuing professional education, retirement plan contributions, medical insurance and reimbursements, all professional and business club dues and all financial incentives previously established for new business generated."  Additionally, until January 1, 2008, for any client Hjerpe has already brought to the firm (listed on Exhibit B), and for any new client Hjerpe brings into the firm, Hjerpe will be entitled to receive 20% of collected billings from that client, in addition to his regular compensation.

7. <u>Management of the Partnership</u>.  Until January 1, 2008, Thoma shall have sole voice in the management of the partnership, but each party shall devote his full time to the conduct of the business.  Without Thoma's written consent, Hjerpe shall not, on the partnership's behalf:
    a)    Borrow or lend money;
    b)    Make, deliver, or accept commercial paper;
    c)    Execute any mortgage, security agreement, bond or lease; or

**[*12]**      d)      Buy or execute a purchase agreement, sell or execute a sales agreement for any property other than that bought or sold in the regular course of the partnership's business.

After January 1, 2008, Hjerpe shall be the managing partner. Hjerpe shall devote his full time to the conduct of the business. Thoma shall devote 300 to 500 hours of billable time during the period of January 1 to April 15 each year (until April 15, 2012), and shall devote such additional time as may be agreed between Thoma and Hjerpe. After January 1, 2008, without Hjerpe's written consent, Thoma shall not, on the partnership's behalf:

     a)      Borrow or lend money;

     b)      Make, deliver, or accept commercial paper;

     c)      Execute any mortgage, security agreement, bond or lease; or

     d)      Buy or execute a purchase agreement, sell or execute a sales agreement for any property other than that bought or sold in the regular course of the partnership's business.

8. <u>No Sale or Assignment of, or Granting Lien on Partnership Interest</u>. Without the other's written consent, no partner shall:

     a)      Assign, mortgage, give a security interest in, or sell his or her partnership interest;

     b)      Agree with a party not privy to this agreement that the outside party will have an interest in the partnership; or

     c)      Do anything that would be detrimental to the partnership's ability to conduct its business.

9. <u>Partnership Bank Account</u>. All partnership funds shall be deposited in its name in an account with the Commerce Bank located at Bloomington, IL, or such other bank or banks as the partners may agree upon from time to time.

10. <u>Partnership Books and Records</u>. The partnership books of account will be kept in accordance with generally accepted accounting principles. The books and supporting records will be

[*13] maintained at the partnership's principal office. The partnership's fiscal year shall start on January 1 and close on December 31. The partners shall prepare an income statement and balance sheet, for each fiscal year, within two months after the end of the fiscal year. These financial statements shall be binding upon the partners as to income or losses and the balances in the partners' income and capital accounts. In the event of a dispute between Thoma and Hjerpe, they shall retain Sherri Chinski, CPA to review the partnership records, and to reconcile/resolve any disputed entries.

11. <u>Voluntary Dissolution of Partnership</u>. The Partners may agree to dissolve the Partnership at any time. Should the Partners so agree, they will liquidate the Partnership in an orderly fashion.

12. <u>Modification of Partnership</u>. Effective January 1, 2008, Hjerpe shall become the general partner, and Thoma's interest in the partnership shall be limited. Effective January 1, 2008 (or earlier in the event of the death of Thoma):

a) All accounts receivable, all unbilled work in process, and all assets and liabilities not otherwise specifically mentioned herein, as of December 31, 2007 shall remain the property of Roland J. Thoma.

b) Hjerpe shall purchase, and Thoma shall sell, all of the office furniture, fixtures, file cabinets, computers, copy machines, fax machines, printers (essentially all depreciable office equipment), and all leasehold improvements, for a purchase price of $30,000.00. (The parties may choose to have Hjerpe waive his interest in a deferred compensation package and in return receive the aforesaid personal property without further payment.)

c) Thoma shall assign to Hjerpe, the existing lease of the business premises from State Farm Insurance, including all early termination benefits, if any, or will sublease the premises to Hjerpe on the same terms and conditions as the existing lease.

**[\*14]**     d)     Hjerpe shall pay to Thoma, for the goodwill of Thoma & Associates, CPAs, the following:

1)     On or before the 15th day of each month following the end of each calendar quarter (the first payment being due April 15, 2008), Hjerpe shall pay to Thoma twenty percent of the collected billings from clients Thoma has brought to the firm (which shall be established by a listing of clients shown on Exhibit A attached hereto).  Both parties recognize that as Thoma brings further clients into the business, this Exhibit may be expanded from time to time.

2)     On December 31, 2012 a detailed calculation of all accounts receivable and work in process shall be made and the full payment of twenty percent of that amount shall be paid to Thoma by April 15, 2013.

3)     For purposes of this agreement, a client at December 31, 2007 who expands and forms other businesses or who changes the current form of his business shall be considered to remain that same client.

4)     During the period from January 1, 2008 to December 31, 2012, Thoma shall be required to work three hundred hours between January 1 and April 15 of each year and shall be paid forty percent of collected billings on work done by him.

5)     During the period from January 1, 2008 to December 31, 2012, (and particularly during the period from April 15 to December 31 of each year during that period), if a new client requires that Thoma personally perform accounting services for him or her, Thoma may do so, and may use the offices and equipment of the partnership, and shall pay to the partnership 20% of collected billings on work done personally by him.

**[*15]**  6)  During the period January 1, 2008 to December 31, 2012, Thoma shall have access to all income records (but not expense records), time records, and billing records, and collection and client records reasonable or necessary for Thoma to verify the correctness of payments made to him.

7)  By agreement of the parties the name of the firm may be changed to Thoma and Hjerpe, CPAs.

13.  Effect of Partner's Death.  In the event of the death of Thoma, the parties will immediately put into effect the provisions of paragraph 12 a), 12 b), and 12 c) l-3 above.  The death of Hjerpe prior to January 1, 2008 will terminate this agreement (with the sole interest of Hjerpe's estate in the partnership being Hjerpe's earned but unpaid compensation).  Hjerpe's death after January 1, 2008 but before December 31, 2012 shall have the effect of making Thoma a general partner solely for the purpose of carrying out the provisions of this agreement and winding up the business affairs of the firm, for the benefit of Hjerpe's estate.  If Hjerpe elects to obtain life insurance on his life in order to satisfy, in whole or in part, his obligations to Thoma under the terms of this agreement, then the amount of any life insurance proceeds shall be deducted from the amount otherwise due to Thoma under this agreement.  Thoma shall be entitled to a reasonable fee for winding up the affairs of the firm.

14.  Arbitration of Disputes.  Any controversy concerning this contract will be settled by arbitration according to the rules of the American Arbitration Association, and judgment upon the award may be entered in any court.

As indicated above, the 2005 agreement required that from January 1, 2006, until January 1, 2008, Mr. Hjerpe make quarterly payments to Mr. Thoma equal to 20% of the collected billings from Mr. Thoma's clients listed on Exhibit A attached to the contract.  The 2005 agreement also required that from January 1,

2006, until January 1, 2008, Mr. Hjerpe be paid 20% of the collected billings from any client that Mr. Hjerpe had brought to the firm and was listed on Exhibit B attached to the contract. However, the 2005 agreement does not contain any Exhibit A or B, or any document listing Mr. Thoma's and Mr. Hjerpe's clients.

The 2010 agreement provided in relevant part as follows:

**AGREEMENT FOR THE PURCHASE OF CERTAIN ASSETS OF THOMA & HJERPE, CERTIFIED PUBLIC ACCOUNTANTS, FORMERLY KNOWN AS THOMA & ASSOCIATES, CPAs**

THIS INTEGRATED ASSET PURCHASE AGREEMENT / BUSINESS ACQUISITION AND EMPLOYMENT / SUB-CONTRACTOR AGREEMENT is made and entered into this 28th day of January, 2010 by and between **ROLAND J. THOMA**, an Illinois resident and **ROLAND J. THOMA as owner/partner of THOMA & HJERPE, CERTIFIED PUBLIC ACCOUNTANTS, formerly known as THOMA & ASSOCIATES, CPAs** (hereinafter referred to as "SELLER"), and **ERIC L. HJERPE**, an Illinois resident (hereinafter referred to as "PURCHASER"). The business described above, and that which is the subject of this agreement, shall be referred to throughout this agreement as "business".

#### RECITALS

**WHEREAS**, The parties entered into an agreement dated August 1, 2005 providing for Seller's sale of the business and its assets to Purchaser and they both now wish to restate that agreement in its entirety; and

[*17] **WHEREAS**, Purchaser desires to purchase the business and certain assets from the Seller upon the terms and conditions set forth herein and to obtain from the Seller a covenant not to compete; and

**WHEREAS**, Seller is willing to sell the business and assign such assets to the Purchaser, and to enter into a covenant not to compete with Purchaser upon the terms and conditions set forth herein; and

**WHEREAS**, Seller, in addition to selling the business and certain of its assets to Purchaser on the terms set forth herein, also desires to obtain from the Purchaser an offer of employment, as an employee, or independent contractor; and

**NOW, THEREFORE**, in consideration of the terms, conditions and mutual agreements of the parties contained herein, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereby agree as follows:

## ARTICLE I
### Sale of Assets

**Section 1.1 Assets to be Sold**
Subject to all of the terms and conditions of this Agreement, Seller hereby sells to Purchaser and Purchaser hereby agrees to purchase from Seller the following assets of the business:

a. All leasehold improvements to the premises at 2425 E Lincoln, Bloomington Illinois (the leased premises); and

b. All furniture, office equipment, office supplies and miscellaneous tangible personal property on the leased premises as of the date of this agreement; and

c. All rights and obligations of seller as lessee under his lease of the leased premises; and

d. All rights in and to the name "Thoma & Associates, CPAs, and Thoma & Hjerpe, Certified Public Accountants"; and

e. All available data and records related to the operations of Seller, including client and customer lists, billing records

[*18] and fees charged to clients, referral sources, research and development reports, production reports, service and warranty records, equipment logs, operating guides and manuals, financial and accounting records, creative materials, advertising materials, promotional materials, studies, reports, correspondence and other similar documents and records and, subject to Legal Requirements, copies of all personnel records; and

    f. All of the intangible rights and property of Seller, including Intellectual Property Assets, going concern value, goodwill, telephone, telecopy and email addresses and listings

All of the assets, property and rights of the Seller to be transferred to the Purchaser pursuant hereto are collectively referred to as the "Assets".

\* \* \* \* \* \* \*

## ARTICLE II
### Allocation of Purchase Price and Terms of Payment

**Section 2.1 Purchase Price and Allocation**

The purchase price to be paid by the Purchaser to the Seller for the sale and transfer of the Assets to the Purchaser in accordance with the provisions of this Agreement is the sum of **Eight Hundred Ninety One Thousand Ninety Four Dollars and Four Cents ($891,094.04)** and shall be allocated as follows:

    a. $5,000 to Seller's covenant not to compete and

    b. $886,094.04 to Seller's goodwill and other assets being sold as set forth in Section1.1 hereof

**Section 2.2 Payment of Purchase Price**

The Purchaser shall pay the purchase price to the Seller as follows:

a.    An initial payment of $**211,596.29** has been paid by Purchaser and Seller acknowledges receipt thereof;

b.    The balance of $**679,497.75** shall be payable in accordance with Purchaser's promissory note attached hereto as Exhibit A and shall be secured by a first purchase money security interest against the assets of the business.

## ARTICLE III
### Covenant Concerning Competition, Solicitation and Disparagement

In order for this agreement to serve the best interests of all parties, it is inherently important that the parties strive to continue to improve the overall outlook of the business by way of its impression in the community. Because this business is substantially a professional services organization, it relies upon the very professionals, who work for, under, on its behalf, in its employ, etc., to provide services to its customers. Therefore, it is critical that the parties to this agreement agree that this provision concerning nondisparagement is crucial.

**Section 3.1 Mutual Non-Disparagement**
The Seller and the Purchaser agree not to make any statements, whether written or oral, or engage in any activity which is detrimental to the name and/or reputation of the acquired business, or of the personal reputations of the Purchaser and Seller, nor make any disparaging comments concerning the business, including without limitation its products, services, personnel, partner, accountants, professionals, plans, operations or other such that it may potentially be detrimental to the business.

**Section 3.2 Covenant Not to Compete**
Seller and Purchaser have agreed that Purchaser shall pay to the Seller the sum of **FIVE THOUSAND DOLLARS ($5,000)** as valuable consideration for the Seller's acceptance of the terms of this Covenant Not to Compete.

[*20] Seller agrees not to compete with Purchaser in the practice of Public Accounting, or providing Accounting Services, while working for Purchaser, and for a period of four (4) years after Seller leaves the employ, of Purchaser. Competing with Purchaser is defined to mean engaging in Public Accounting or providing accounting services within a radius of 100 miles of 2425 E. Lincoln, Bloomington, Illinois 61701.

For purposes of this covenant not to compete, competition is also defined as soliciting or accepting employment by, or rendering professional services to, any person or organization that is or was a client of the business.

### §3.2.1 EXCEPTIONS TO COVENANT NOT TO COMPETE

Purchaser hereby expressly authorizes the following acts of Seller that would otherwise violate the Covenant Not to Compete:

1. Seller may complete 1040's of his direct descendants per stirpes and is entitled to keep all sums earned for these transactions, and

2. Upon express written permission of the Purchaser, Seller may complete tax work of clients personally requesting Seller as their accountant. In the event this situation arises, the Client(s) shall be billed through the office of Thoma & Hjerpe and Seller will be paid Fifty Percent (50%) of his hourly rate upon the business being paid in full for the service provided.

   *      *      *      *      *      *      *

**Section 5.6 Sale of Practice**
Purchaser agrees that if he sells the business of Thoma & Hjerpe, all amounts payable under this agreement shall become due immediately.

**[*21]** Purchaser agrees to defend, indemnify, hold harmless and pay all reasonable fees and expenses which may arise if Seller is required to and is successful in enforcing any provisions of Purchaser's obligations to Seller as set forth herein.

\*      \*      \*      \*      \*      \*      \*

## ARTICLE IX
## Employment Agreement

**Section 9.1 Nature and Place of Employment**
Thoma & Hjerpe, Certified Public Accountants is an accounting firm with its principal place of business located in Bloomington, Illinois doing business throughout the state of Illinois. In certain circumstances, it is acknowledged that the firm may have, or in the future may have, business interests outside of the state of Illinois.

**Section 9.2 Manner of Performance of Employee's Duties**
Purchaser is principal employer. Seller/Employee, so long as Purchaser is not in default under any term of this agreement retains no management, supervisory, or other similar roles with respect to the operation of the business. Seller/Employee will maintain professional standards while also observing the rules and obligations as any employee of the business as outlined in the Employee Manual, SOP Manual, or other materials, or as otherwise directed by the Purchaser/Employer. Any action to the contrary shall be construed as a specific violation of this agreement. Seller/Employee's status in this agreement is to be considered an at will employee.

**Section 9.3 Duration of Employment and Hours**
- From January 1, 2008, until January 1, 2013.
- Seller/Employee shall work appoximately [sic] 40 hours a week from February 1st through April 15th of each year.
- From April 16th through December 31st, Seller/Employee shall work approximately 300-500 hours as needed.

**[\*22]** **Section 9.4 Payment**
Seller/Employee shall be paid Forty Percent (40%) of his standard billing rate and be paid bi-weekly.

**Section 9.5 Benefits**
Effective January 1, 2009, Employer/Purchaser shall pay dues, & educational expenses of Seller/Employee, up to $3,000.00 per year provided documentation has been provided by Employee/Seller.

Seller/Employee shall also be provided an additional sum of **Five Hundred Dollars ($500.00)** per year as an entertainment subsidy. Purchaser/Employer shall have no say in what this sum of money is spent on.

Seller/Employee shall continue to occupy his current office through January 1, 2013. However, in the event of the purchase of a new office for the business, he will be provided with a workspace substantially similar to what he has been accustomed.

**Section 9.6 Employee Obligations**

A. **CPE**:
It is the responsibility of the Seller/Employee to maintain the requirements for continued education as a CPA.

B. **CODE OF CONDUCT**:
Seller/Employee shall perform at the highest level of professional conduct measured by the normal standards of the accounting profession.

C. **CONFIDENTIAL COMMUNICATION**:
All information whether competitive or otherwise and communications (written or oral) are considered confidential. Seller/Employee agrees that any communications or information relating to the business, and/or originating in the business are completely confidential. At no time shall this information be divulged to other parties.

**[*23] Section 9.7 Option to Terminate Contract for Permanent Disability of Employee**

Notwithstanding anything in this agreement to the contrary, Purchaser/Employer has the option to terminate employment in the event that during its term Seller/Employee becomes permanently disabled as the term permanently disabled is defined below. The option may be exercised by Purchaser/Employer giving notice to Seller/Employee by registered mail to his home address of his intention to terminate this employment on the last day of the month during which notice is mailed, and on the giving of notice this agreement and the term of this agreement comes to an end on the last day of the month in which the notice is mailed, with the same force and effect as if that day were originally stated as the termination date. For the purposes of this employment, Seller/Employee will be deemed to have become permanently disabled if, during any year of the term of this employment, because of ill health, physical or mental disability, or for other causes beyond his control, he will have been continuously unable or unwilling or have failed to perform his duties under this contract for 60 consecutive days, or if, during any year of the term of this employment, he will have been unable or unwilling or have failed to perform his duties for a total period of 120 days, either consecutive or not. For the purposes of this employment, the term "any year of the term of this employment" is defined to mean any period of 12 calendar months commencing on the first day of January and terminating on the 31st day of December.

**Section 9.8 Discontinuance of Business as Termination of Employment**

Notwithstanding anything in this agreement to the contrary, in the event that Purchaser/Employer discontinues operating its Firm in Illinois, then this employment agreement will terminate as of the last day of the month in which Purchaser/Employer ceases operations at any location with the same force and effect as if that day were originally stated as the termination date of this agreement.

**[\*24] Section 9.9 Commitments Binding on Employer Only on Written Consent**
Anything contained in this agreement to the contrary notwithstanding, it is understood and agreed that Seller/Employee will not have the right to make any contracts or commitments for or on behalf of Purchaser/Employer without the written consent of Purchaser/Employer.

**Section 9.10 Managerial Roles in Billing**
Purchaser/Employer agrees to allow Seller/Employee discretion in setting rates and times on client matters which he personally works on. However, all billings must be approved by Purchaser/Employer. This section is an attempt to allow for Seller/Employee to retain certain agreements that he has had with past clients without any interruption in business as usual.

Seller/Employee will have no access to files or billings of clients in which he does not personally and substantially work. Furthermore, he shall have no say in the billing rates and times of such files.

The last two pages of the 2010 agreement include a table titled "Amortization Schedule--Normal Amortization". The table sets forth a series of 20 installment sale payments that add up to $1 million.[5] Above the table are two notations: "Compound Period: Quarterly" and "Nominal Annual Rate: 4.000%".

---

[5]The 2010 agreement also includes a table titled "Cash Flow Data". Because all the information in the "Cash Flow Data" table is also reflected in the "Amortization Schedule--Normal Amortization" table, and we reproduce the information in the "Amortization Schedule--Normal Amortization" table, it is unnecessary to separately reproduce the information in the "Cash Flow Data" table.

[*25] The information in the table attached to the 2010 agreement is reproduced below, with figures rounded to the nearest dollar:

| | Date | Payment | Interest | Principal | Balance |
|---|---|---|---|---|---|
| Loan | 4/15/2008 | | | | $891,094 |
| 1 | 4/15/2008 | $32,706 | -0- | $32,706 | 858,388 |
| 2 | 7/15/2008 | 46,835 | $8,584 | 38,251 | 820,137 |
| 3 | 10/15/2008 | 24,047 | 8,201 | 15,846 | 804,291 |
| 2008 Totals | | 103,588 | 16,785 | 86,803 | |
| 4 | 1/15/2009 | 21,179 | 8,043 | 13,136 | 791,156 |
| 5 | 4/15/2009 | 40,912 | 7,912 | 33,001 | 758,155 |
| 6 | 7/15/2009 | 53,362 | 7,582 | 45,781 | 712,374 |
| 7 | 10/15/2009 | 40,000 | 7,124 | 32,876 | 679,498 |
| 2009 Totals | | 155,453 | 30,660 | 124,794 | |
| 8 | 1/15/2010 | 40,000 | 6,795 | 33,205 | 646,293 |
| 9 | 4/15/2010 | 40,000 | 6,463 | 33,537 | 612,756 |
| 10 | 7/15/2010 | 40,000 | 6,128 | 33,872 | 578,883 |
| 11 | 10/15/2010 | 40,000 | 5,789 | 34,211 | 544,672 |
| 2010 Totals | | 160,000 | 25,174 | 134,826 | |
| 12 | 1/15/2011 | 40,000 | 5,447 | 34,553 | 510,119 |
| 13 | 4/15/2011 | 40,000 | 5,101 | 34,899 | 475,220 |
| 14 | 7/15/2011 | 40,000 | 4,752 | 35,248 | 439,972 |
| 15 | 10/15/2011 | 40,000 | 4,400 | 35,600 | 404,372 |
| 2011 Totals | | 160,000 | 19,700 | 140,300 | |
| 16 | 1/15/2012 | 40,000 | 4,044 | 35,956 | 368,416 |
| 17 | 4/15/2012 | 40,000 | 3,684 | 36,316 | 332,100 |
| 18 | 7/15/2012 | 40,000 | 3,321 | 36,679 | 295,421 |
| 19 | 10/15/2012 | 40,000 | 2,954 | 37,046 | 258,375 |
| 2012 Totals | | 160,000 | 14,003 | 145,997 | |
| 20 | 1/15/2013 | 260,959 | 2,584 | 258,375 | |
| 2013 Totals | | 260,959 | 2,584 | 258,375 | |
| Grand tot. | | 1,000,000 | 108,906 | 891,094 | |

**[*26]** As indicated above, the 2010 agreement required Mr. Hjerpe to pay Mr. Thoma a "balance" of $679,498 in accordance with a promissory note from Mr. Hjerpe that was attached to the 2010 agreement. However, no promissory note from Mr. Hjerpe was attached to the 2010 agreement.

2.    <u>Mr. Thoma's work for Thoma & Hjerpe and biweekly payments for his accounting services</u>

Mr. Thoma brought over clients from his sole proprietorship to Thoma & Hjerpe, and he continued working for them through Thoma & Hjerpe. Mr. Hjerpe also brought over his clients to Thoma & Hjerpe, and he continued working for them through Thoma & Hjerpe.

From 2006 until November 2011 Mr. Thoma provided accounting services solely through Thoma & Hjerpe. Mr. Thoma worked solely for his clients. In November 2011 Mr. Thoma and Mr. Hjerpe had a falling out and Mr. Thoma left Thoma & Hjerpe. The circumstances of the falling out are discussed in greater detail <u>infra</u> pp. 34-38. Mr. Hjerpe also provided accounting services through Thoma & Hjerpe, but he performed services only for his clients.

While working for Thoma & Hjerpe, Mr. Thoma performed accounting services at the following locations: (1) the premises of Thoma & Hjerpe, (2) the clients' places of business, and (3) Mr. Thoma's personal residence.

[*27] Thoma & Hjerpe paid Mr. Thoma $69,156 and $63,299 for accounting services rendered in 2010 and 2011, respectively. These amounts are separate and distinct from the quarterly installment sale payments that Mr. Hjerpe paid to Mr. Thoma in 2010 and 2011 for the purchase of Mr. Thoma's ownership interest in Thoma & Hjerpe. See infra pp. 29-32.

Thoma & Hjerpe reported the amounts paid to Mr. Thoma in 2010 and 2011 for his accounting services as guaranteed payments to a limited partner on Schedule K-1, Partner's Share of Income, Deductions, Credits, etc. The notice of deficiency determined that the payments were not guaranteed payments, but rather wages. See infra p. 53.

In 2010 and 2011 Thoma & Hjerpe usually paid Mr. Thoma for his accounting services every two weeks. The parties agree that the biweekly payments were calculated in accordance with the 2010 agreement, which provided: "Seller/Employee [i.e., Mr. Thoma] shall be paid Forty Percent (40%) of his standard billing rate and be paid bi-weekly."[6] The record shows (and we

---

[6]The January 11 and 23, 2010, payments were likely governed by the 2005 agreement, and not the 2010 agreement, because the 2010 agreement was executed on January 28, 2010. The 2005 agreement required that Mr. Thoma receive 40% of "collected billings on work done by him." However, despite this requirement, it appears the two January 2010 payments were based on billings without regard to client collections.

**[*28]** find) that the biweekly payments were mathematically equal to a flat $68 per hour rate multiplied by the number of hours in each biweekly period. Under the 2010 agreement, this means that the standard billing rate was $170, because $170 per hour × 40% = $68 per hour. We find that the standard billing rate used to calculate Mr. Thoma's biweekly payments was $170 per hour.[7]

Mr. and Ms. Thoma also assert that Mr. Thoma's biweekly payments were based on amounts collected from clients. The trial record does not support that contention either. It shows that the payments were based on the number of hours that Mr. Thoma billed, without regard to whether the amounts billed were collected from clients.

The number of hours used to compute the biweekly payments to Mr. Thoma, and the amount of the biweekly payments made to him, varied by season. The number of hours and biweekly payment amounts were significantly greater during February, March, and April of 2010 and 2011.

---

[7]Mr. and Ms. Thoma assert that Mr. Thoma's biweekly payments were calculated using different billing rates. The trial record does not support that contention. The trial record shows that Mr. Thoma's biweekly payments were calculated by multiplying Mr. Thoma's number of hours by a uniform $68 hourly rate. While it may be that Mr. Thoma's clients were billed at different rates for Mr. Thoma's time, the billing rate upon which Mr. Thoma's compensation was calculated (i.e., the "standard billing rate" as that term was used in the 2010 agreement) did not vary.

[*29] No amounts were withheld from the biweekly payments to Mr. Thoma. No federal or state tax was withheld from Mr. Thoma's biweekly payments. No Federal Insurance Contributions Act tax or Medicare tax was withheld. No amounts were withheld as SIMPLE IRA contributions.

While Mr. Thoma worked for Thoma & Hjerpe in 2010 and 2011, he did not receive any paid sick leave or paid vacations.

Thoma & Hjerpe had professional liability insurance during 2010 and 2011, and Mr. Thoma was included on the policy.

3.   Mr. Thoma's sale of his interest in Thoma & Hjerpe and quarterly installment payments

Section 12(b) of the 2005 agreement called for Mr. Hjerpe to pay Mr. Thoma $30,000 for office equipment and leasehold improvements. Section 12(d) called for Mr. Hjerpe to make installment payments to Mr. Thoma for "the goodwill of Thoma & Associates, CPAs". According to the 2005 agreement, the installment payments were to be made from April 15, 2008, to April 15, 2013, covering the period January 1, 2008, to December 31, 2012. The amount of the installment payments was to be equal to "twenty percent of the collected billings from clients Thoma has brought to the firm".

**[*30]** The 2010 agreement acknowledged in its recitals that the 2005 agreement provided for the sale of Mr. Thoma's interest in Thoma & Hjerpe to Mr. Hjerpe. The 2010 agreement stated that Mr. Thoma and Mr. Hjerpe "wish[ed] to restate that [2005] agreement in its entirety." Section 1.1 of the 2010 agreement required that Mr. Thoma sell to Mr. Hjerpe various itemized assets of Thoma & Hjerpe upon execution of the 2010 agreement. Section 3.2 required Mr. Thoma not to compete with Mr. Hjerpe within a 100-mile radius for four years after leaving Mr. Hjerpe's employment. Section 2.1 required Mr. Hjerpe to pay Mr. Thoma $891,094, composed of $886,094 for the assets of Thoma & Hjerpe and $5,000 for the covenant not to compete. Section 2.2 stated that $211,596 of the $886,094 had already been paid, leaving an unpaid balance of $679,498.

The table attached to the 2010 agreement listed 20 quarterly installment payments. Their dates and amounts are such that the discounted present value of the total, using a 4% quarterly interest rate, is $891,094 on April 15, 2008. The table assumes as historical fact that Mr. Hjerpe had paid Mr. Thoma the first seven installments in 2008 and 2009. The table divides each of these past payments into principal and interest components. The table lists 13 future payments, also divided into principal and interest components. The 2008 "Principal" total of $86,803 and the 2009 "Principal" total of $124,794 add up to $211,596, which is

[*31] the same amount as the "initial payment" specified in Section 2.2 of the 2010 agreement. See supra p. 19. The aggregate sum of the "Principal" totals for 2010, 2011, 2012, and 2013 is $679,498, the same amount as the balance of the purchase price specified in Section 2.2 of the 2010 agreement. See supra p. 19.

There is no dispute that Mr. Hjerpe paid Mr. Thoma the first seven installment payments listed in the table. Mr. Hjerpe paid three installment payments in 2008, totaling $103,588, and four in 2009, totaling $155,453. These seven installment payments add up to $259,041.

The IRS alleges that the first seven installment payments were computed in accordance with the 2005 agreement, providing that the installment payments were to equal 20% of the collected billings from Mr. Thoma's clients. Though the trial record discloses the amounts of the first seven installment payments, which were made in 2008 and 2009, it does not disclose how these installment payments were computed. The trial record does not indicate whether the seven installment payments were calculated using the formula from the 2005 agreement.

For 2010 and 2011 the table lists eight $40,000 installment payments. The parties do not dispute that Mr. Hjerpe paid Mr. Thoma all eight, for a total of $320,000. From 2008 to 2011, inclusive, Mr. Hjerpe made payments of principal and interest to Mr. Thoma totaling $579,041.

**[\*32]** Mr. Hjerpe stopped making installment payments to Mr. Thoma in 2012. Accordingly, Mr. Thoma did not receive the $160,000 in installment payments listed in the table attached to the 2010 agreement for 2012, nor the final $260,958 installment payment for 2013.

4.  Thoma & Hjerpe's SIMPLE IRA plan and Mr. Thoma's contributions to his SIMPLE IRA

At some point before 2010 Thoma & Hjerpe established a SIMPLE IRA plan under section 408(p). A SIMPLE IRA plan is a small-employer-sponsored individual retirement plan that is funded by employee compensation deferrals and employer matching contributions.[8] See sec. 408(p)(1) and (2).

A SIMPLE IRA plan can be established by executing a Form 5304-SIMPLE or Form 5305-SIMPLE.[9] Notice 97-6, 1997-1 C.B. 353; Notice 98-4, 1998-1 C.B. 269; I.R.S. News Release IR-96-55 (Dec. 30, 1996). The trial record does not contain either form or any other documents about the establishment of the SIMPLE IRA plan. Mr. Thoma had a SIMPLE IRA through Thoma & Hjerpe's

_____

[8]A SIMPLE IRA plan can be either an individual retirement account described in sec. 408(a) or an individual retirement annuity described in sec. 408(b). Secs. 408(p)(1), 7701(a)(37)(A) and (B).

[9]Forms 5304-SIMPLE and 5305-SIMPLE are not filed with IRS. See I.R.S. Form 5304-SIMPLE (December 1996); I.R.S. Form 5305-SIMPLE (October 1996). Instead, the creator of the SIMPLE IRA plan keeps a copy for its records. Id.

- 33 -

[*33] SIMPLE IRA plan before 2010. The trial record does not disclose when Mr. Thoma opened his SIMPLE IRA. The trial record does not disclose any information about the contributions to Mr. Thoma's SIMPLE IRA in years before 2010. Thus, we do not know the dates or amounts of contributions, or who made the contributions before 2010.

In 2010 and 2011 Thoma & Hjerpe withheld amounts from its employees' compensation to fund deposits and make contributions on their behalf to their SIMPLE IRAs. In 2010 and 2011 Mr. Hjerpe was the individual responsible for making both the employer portion and employee portion of the SIMPLE IRA plan contributions. However, Mr. Hjerpe did not make all the required SIMPLE IRA plan contributions. In October 2011 Mr. Thoma reported to the U.S. Department of Labor that Mr. Hjerpe had failed to make all the required SIMPLE IRA plan contributions.

During the years at issue Mr. Thoma and Mr. Hjerpe had an understanding that Thoma & Hjerpe, as plan sponsor, would not withhold amounts from Mr. Thoma's biweekly accounting services payments to fund deposits into his SIMPLE IRA and that Thoma & Hjerpe would not make contributions on Mr. Thoma's behalf to his SIMPLE IRA. Instead, Mr. Thoma deposited funds from his personal bank account via check into his SIMPLE IRA. The parties agree that

**[*34]** the total amounts Mr. Thoma directly deposited into his SIMPLE IRA were $15,711 in 2010 and $14,000 in 2011.

5. <u>Mr. Thoma and Mr. Hjerpe's falling out; Mr. Thoma's professional licensing authority complaint; Mr. Thoma's lawsuit for remaining quarterly installment payments; Mr. Thoma's unemployment benefits claim</u>

Around November 3, 2011, the U.S. Department of Justice sent a letter to Thoma & Hjerpe. The trial record does not include a copy of the letter. At trial Mr. Thoma described the letter as a civil investigative demand, issued personally to him, that requested the records of one or more of his clients. We make no findings as to contents of the letter. Mr. Thoma responded to the letter but never informed Mr. Hjerpe about it. Mr. Hjerpe eventually learned about the letter. A few weeks later, on November 20, 2011, Mr. Thoma arrived at the offices of Thoma & Hjerpe and found that the locks had been changed. He also discovered he no longer had access to the network, client files, and email accounts. That same day Mr. Thoma received a letter from Mr. Hjerpe informing him that he was being placed on administrative leave for his "gross mishandling" of the U.S. Department of Justice letter and asking him to "refrain from contacting any of our clients" until Mr. Hjerpe had "a better handle on what is going on". Mr. Thoma did not provide any accounting services to his clients at Thoma & Hjerpe after receiving Mr. Hjerpe's letter. His professional and business association with

[*35] Thoma & Hjerpe ended on November 20, 2011, the day Mr. Hjerpe placed him on administrative leave. We now discuss the relevant events that occurred after Mr. Thoma left Thoma & Hjerpe.

Mr. and Ms. Thoma claim in their briefs that in 2010 and 2011 Thoma & Hjerpe was issued a professional accounting license by the State of Illinois, that the license listed Thoma & Hjerpe as a partnership (and Mr. Thoma and Mr. Hjerpe as its partners), and that Mr. Hjerpe operated Thoma & Hjerpe under the same license even after Mr. Thoma had left Thoma & Hjerpe in November 2011. They further claim that after Mr. Thoma left Thoma & Hjerpe, he filed a complaint with the Illinois professional licensing authority that requested removal of Mr. Thoma's name from Thoma & Hjerpe's license. The trial record does not contain the professional accounting license for Thoma & Hjerpe. It contains a supplemental renewal form for public accounting firms licensed in Illinois, signed by Mr. Hjerpe. The form is dated August 10, 2009, and under "firm name" lists "Thoma & Hjerpe CPAs". Mr. Hjerpe and Mr. Thoma's names are listed under the box that states: "The following is a list of changes in members of the above firm as of this date". At trial Mr. Thoma did not provide an explanation for the information in this supplemental renewal form. Neither do Mr. and Ms. Thoma's briefs. The form itself does not suggest that this particular form was to be

[*36] completed only by businesses seeking to be licensed as partnerships. The trial record does not contain a complaint by Mr. Thoma to the Illinois professional licensing authority. It does contain a letter to Mr. Thoma from the Illinois professional licensing authority, dated December 27, 2011. The letter acknowledges receipt of a complaint from Mr. Thoma but does not reveal the nature of Mr. Thoma's complaint. The IRS' briefs contend that the information shown on the license renewal form and the letter to Mr. Thoma from the Illinois professional licensing authority are insufficient to support Mr. and Ms. Thoma's claims concerning the professional licensing of Thoma & Hjerpe in 2010 and 2011. We agree with the IRS. We do not find that Mr. and Ms. Thoma's assertions in their briefs concerning the professional licensing of Thoma & Hjerpe in 2010 and 2011 are correct: that is, we do not find that Thoma & Hjerpe was operated in 2010 and 2011 under a professional accounting license issued by the State of Illinois naming Thoma & Hjerpe as a partnership and Mr. Thoma and Mr. Hjerpe as its partners.

By the time Mr. Thoma left Thoma & Hjerpe, Mr. Hjerpe had paid him principal and interest totaling $579,041 for his ownership interest in Thoma & Hjerpe. Mr. Hjerpe was required to pay the remaining $420,959 balance in five quarterly installment payments, four in 2012 and one in 2013. The first

[*37] installment payment of 2012 was due on January 15, 2012, but Mr. Hjerpe failed to make that payment. On or about January 23, 2012, Mr. Thoma filed a lawsuit against Mr. Hjerpe for Mr. Hjerpe's failure to make that quarterly installment payment. Mr. Hjerpe also failed to make the other three payments due in 2012 (April 15, July 15, and October 15), and the final payment due on January 15, 2013. By the time trial in this case took place in October 2016, Mr. Hjerpe still had not paid Mr. Thoma the remaining $420,959.[10]

At some point after November 20, 2011, Mr. Thoma filed a claim for unemployment benefits with the Illinois Department of Employment Security.

On March 7, 2012, the Illinois Department of Employment Security mailed a letter to Mr. Thoma explaining that it was denying him unemployment benefits on grounds that he had been discharged from Thoma & Hjerpe for misconduct connected with work: specifically, his failure to inform Mr. Hjerpe about the letter from the U.S. Department of Justice.

On March 19, 2012, Mr. Thoma submitted a "Request for Reconsideration" appealing the March 7, 2012 decision of the Illinois Department of Employment

---

[10]However, Mr. and Ms. Thoma state in their answering brief that "due to recent court proceedings, * * * [Mr. Thoma] ended up getting the full payments on * * * [his] contract some five years beyond the due dates."

[*38] Security. In the request Mr. Thoma stated that "[o]n November 21, 2011, I was an employee of Thoma & Hjerpe, CPAs."

On March 26, 2012, Mr. and Ms. Thoma, through their attorneys, filed a complaint in the Circuit Court of McLean County, Illinois, against Thoma & Hjerpe and Mr. Hjerpe. The complaint alleged that Thoma & Hjerpe's termination of Mr. Thoma was illegal.

On April 24, 2012, an Illinois administrative law judge reversed the decision of the Illinois Department of Employment Security and held that Mr. Thoma was eligible for unemployment benefits on grounds that he had not engaged in misconduct connected with work.

On July 18, 2012, the Illinois Department of Employment Security Board of Review affirmed the Illinois administrative law judge's decision that Mr. Thoma was eligible for unemployment benefits.

6. Tax reporting

   a. 2010 return

Generally, a partnership files a Form 1065, "U.S. Return of Partnership Income", with the IRS for each tax year to report the partnership's tax items. See sec. 6031. The partnership also files a Schedule K-1 with the IRS to report each partner's share of the partnership's tax items. Id.; sec. 1.6031(a)-1(a)(1) and (2),

[*39] Income Tax Regs.; see also Cambridge Partners, L.P. v. Commissioner, T.C. Memo. 2017-194, at *11. The partnership also sends a copy of the partnership return and partner's Schedule K-1 to each partner. See sec. 6031(b); sec. 1.6031(b)-1T(a)(1), (3), Temporary Income Tax Regs., 53 Fed. Reg. 34490, 34491 (Sept. 7, 1988).

The trial record does not contain a Form 1065 for Thoma & Hjerpe's 2010 tax year or any other year. It contains a Schedule K-1 that Thoma & Hjerpe issued to Mr. Thoma for 2010, but it does not disclose who prepared the Schedule K-1.[11] It does not contain the Schedule K-1 that Thoma & Hjerpe ostensibly issued to Mr. Hjerpe for 2010.

Mr. Thoma's Schedule K-1 for 2010 reported that the name of the partnership was "Thoma & Hjerpe, CPAs" and the name of the partner was Mr. Thoma. The Schedule K-1 stated that he was a limited partner, rather than a general partner.

---

[11]In their briefs Mr. and Ms. Thoma assert that "Eric L. Hjerpe prepared the partnership tax returns. The K-1 form is one page of that tax return." Mr. Thoma did not testify as to bookkeeping and return preparation for Thoma & Hjerpe. The trial record does not contain evidence of return preparation and bookkeeping. The record does not support a finding that Mr. Hjerpe prepared partnership returns for Thoma & Hjerpe or the Schedules K-1.

[*40] The preprinted Schedule K-1 had the following lines to show changes in the partner's capital account: "Beginning capital account", "Capital contributed during the year", "Current year increase (decrease)", "Withdrawals and distributions", and "Ending Capital Account." The beginning and ending capital account lines had entries of zero; the other lines were blank. Mr. Thoma's Schedule K-1 also left blank the lines for year-begin and year-end percentages of his share of profit, loss, and capital, and the line for his share of the liabilities at year-end.

The $69,156 that Thoma & Hjerpe paid Mr. Thoma for accounting services in 2010 appeared on two lines of Mr. Thoma's Schedule K-1 for 2010. Line 4, "Guaranteed payments", had an entry of $69,156. Line 14, "Self-employment earnings (loss)", also had an entry of $69,156. The Schedule K-1 had 18 additional lines for a partner's share of income or loss, e.g., "Ordinary, business income (loss)", "Credits", and "Distributions", but they were all blank.

Mr. Thoma prepared his and Ms. Thoma's Form 1040, "U.S. Individual Income Tax Return", for 2010. The 2010 return reported total wage income of $30,166, which was for Ms. Thoma's work as an employee of Thoma & Hjerpe. The 2010 return reported no wage income for Mr. Thoma.

[*41] Mr. and Ms. Thoma's 2010 return claimed a deduction of $15,711 on line 28, "Self-employed SEP, SIMPLE, and qualified plans", for amounts Mr. Thoma directly deposited into his SIMPLE IRA in 2010.

The 2010 return claimed a deduction of $4,648 on line 29, "Self-employed health insurance deduction", for health insurance premiums that Mr. Thoma paid in 2010.

The 2010 return claimed a deduction for one-half of self-employment tax on line 27. The deduction was $3,724, one-half of Mr. Thoma's self-employment-tax liability reported on Schedule SE, "Self-Employment Tax", discussed <u>infra</u> p. 42.[12]

Mr. and Ms. Thoma attached a Schedule E, "Supplemental Income and Loss", to the 2010 return and reported that Mr. Thoma's gross income inclusion corresponding to "Thoma & Hjerpe, CPAs" was $69,156. It also reported a $7,396 loss from "UPE". The UPE description was intended by Mr. and Ms. Thoma to refer to "unreimbursed partnership expenses", that is, Mr. Thoma's expenses of working for Thoma & Hjerpe.

In reporting Mr. Thoma's gross income pertaining to Thoma & Hjerpe on their 2010 Form 1040, Mr. and Ms. Thoma reported $61,760 ($69,156 income

---

[12]Mr. and Ms. Thoma did not attach a Schedule SE for Ms. Thoma to the 2010 and 2011 returns because she did not have net earnings from self-employment.

**[*42]** share – $7,396 UPE), such that the $7,396 was deducted in arriving at adjusted gross income.

Mr. and Ms. Thoma attached a Schedule F, "Profit or Loss From Farming", to their 2010 return and reported a net farm loss of $4,396.

Mr. and Ms. Thoma also attached a Schedule SE for Mr. Thoma to the 2010 return. The Schedule SE reported that Mr. Thoma had net earnings from self-employment of $52,716 and calculated a self-employment-tax liability for Mr. Thoma of $7,448. The Schedule SE reported that Mr. Thoma's $52,716 in net earnings from self-employment was calculated as follows:

| | |
|---|---|
| Self-employment income from Thoma & Hjerpe | $69,156 |
| Mr. Thoma's unreimbursed partnership expenses related to Thoma & Hjerpe | (7,396) |
| Mr. Thoma's net farm loss | (4,396) |
| Mr. Thoma's expenses for health insurance | (4,648) |
| Mr. Thoma's net earnings from self-employment | 52,716 |

As explained previously, the 2010 return reported a $3,724 income-tax deduction for one-half of the self-employment tax.

Mr. Thoma received $160,000 in installment sale payments from Mr. Hjerpe during 2010, which were unrelated to the accounting services that Mr. Thoma rendered to Thoma & Hjerpe. On their 2010 return Mr. and Ms. Thoma reported that the $160,000 in installment payments was part of an installment sale of

[*43] goodwill that had taken place on December 31, 2008. They attached to their return a Form 6252, "Installment Sale Income", that reported the property sold was "GOODWILL", the "Date sold" was December 31, 2008, and the "Date acquired" was October 1, 1976.

Form 6252 is used to report income from an installment sale using the installment method of accounting. On the Form 6252 taxpayers report all installment payments received during the year from the installment sale on line 21. Taxpayers determine the income from these installment payments by multiplying the amount on line 21 by the gross profit percentage.

Part I of the Form 6252 contains lines for computing the gross profit percentage. Part I is only to be completed for the year of sale. Mathematically, Part I calculates that the gross profit percentage is:

$$\frac{\text{noninterest component of selling price} - \text{basis}}{\text{noninterest component of selling price}}$$

Consistent with the idea that the installment sale took place in 2008, the Form 6252 for 2010 did not contain any information in Part I.

In Part II of the Form 6252 for 2010, on line 21, Mr. and Ms. Thoma reported that the installment payments they received during the year totaled $134,826. The Form 6252 instructs taxpayers to exclude the interest component

[*44] of the installment payments when computing the amount to report on line 21. Note that the table attached to the 2010 agreement contained a schedule of installment payments in which Mr. Hjerpe would pay Mr. Thoma $160,000 in 2010 and that the schedule showed $134,826 of these payments were principal and $25,174 interest. Recall also that installment payments totaling $160,000 were in fact made by Mr. Hjerpe to Mr. Thoma in 2010.

On the Form 6252 for 2010 Mr. and Ms. Thoma reported that the gross profit percentage was 95.51%. The Form 6252 for 2010 does not indicate how the gross profit percentage was computed. The trial record does not include the Form 6252 that they filed for 2008, the year they reported that the installment sale had occurred.

Although the Form 6252 for 2010 does not state how the gross profit percentage was computed, we can deduce from the 2010 agreement (and we find) that the 95.51% gross profit percentage reported on the Form 6252 for 2010 was equal to ($891,094 − $40,000) ÷ $891,094. Recall that $891,094 was the principal, i.e., the noninterest component, of the $1 million in installment payments to be made by Mr. Hjerpe to Mr. Thoma for the assets of Thoma &

[*45] Hjerpe.  Recall also that $40,000 was Mr. Thoma's basis, the amount he paid for a partial ownership interest in the accounting firm.[13]

On the Form 6252 for 2010 Mr. and Ms. Thoma reported that they had $128,772 of income for 2010, corresponding to $134,826 in payments they received in 2010.  To get $128,772, they multiplied $134,826 by 95.51%.  They reported that the $128,772 was income on the main page of the Form 1040.  They also reported that they earned $25,174 in taxable interest on the main page of the Form 1040.

Form 6252 requires taxpayers to report installment payments received in prior years.  On the Form 6252 for 2010 Mr. and Ms. Thoma reported that the installment payments they had received in prior years totaled $211,597.  Recall that $211,597 is the amount of the principal component of installment payments already received by Mr. Thoma from Mr. Hjerpe for the assets of Thoma & Hjerpe, identified in the table attached to the 2010 agreement.

b.    2011 return

As with 2010, the trial record does not contain a Form 1065 for Thoma & Hjerpe's 2011 tax year.  The trial record contains only the Schedule K-1 that Thoma & Hjerpe issued to Mr. Thoma for 2011.  The information on the Schedule

---

[13]The parties agree that Mr. Thoma's basis in Thoma & Hjerpe is $40,000.

**[\*46]** K-1 for 2011 is similar to the information reported on Mr. Thoma's Schedule K-1 for 2010.

Mr. Thoma's Schedule K-1 for 2011 is compared to his Schedule K-1 for 2010 in the table below:

| Item | 2010 | 2011 |
|---|---|---|
| Name of partnership | Thoma & Hjerpe, CPAs | Thoma & Hjerpe, CPAs |
| Name of partner | Mr. Thoma | Mr. Thoma |
| Limited or general partner | Limited | Limited |
| Beginning capital account | -0- | -0- |
| Capital contributed during the year | -- | -- |
| Current year increase (decrease) | -- | -- |
| Withdrawals and distributions | -- | -- |
| Ending capital account | -0- | -0- |
| Year-begin percentages of partner share of profit, loss, and capital | -- | -- |
| Year-end percentages of partner share of profit, loss, and capital | -- | -- |
| Partner share of liabilities at year end | -- | -- |
| Line 4, guaranteed payments | $69,156 | $63,299 |
| Line 14, self-employment earnings (loss) | 69,156 | 63,299 |
| Additional lines for partner's share of income and loss | -- | -- |

[*47] Mr. Thoma prepared his and Ms. Thoma's Form 1040 for tax year 2011. The information reported on Form 1040 for 2011, and the schedules attached thereto, are similar to the information reported for 2010.  The following table summarizes this information:

| Item | 2010 | 2011 |
|------|------|------|
| Ms. Thoma's wage income from Thoma & Hjerpe | $30,166 | $36,492 |
| Line 28 deduction for "Self-employed SEP, SIMPLE, and qualified plans" for amounts Mr. Thoma directly deposited into his SIMPLE IRA | 15,711 | 14,000 |
| Line 29 deduction for "Self-employed health insurance deduction" for Mr. Thoma's health insurance premium expenses | 4,648 | 5,580 |
| Deduction for one-half of Mr. Thoma's self-employment tax reported on his Schedule SE | 3,724 | 2,915 |
| Schedule E:  Mr. Thoma's share of Thoma & Hjerpe's income (a partnership item) | 69,156 | 63,299 |
| Schedule E:  Mr. Thoma's unreimbursed partnership expenses from working for Thoma & Hjerpe | 7,396 | 20,867 |
| Net gross income inclusion corresponding to Thoma & Hjerpe | 61,760 (69,145 – 7,396) | 42,432 (63,299 – 20,867) |
| Schedule F net farm loss | 4,396 | 1,162 |

**[\*48]** As reported, the $20,867 in unreimbursed partnership expenses affected net earnings from self-employment. The Schedule SE for 2011 contained the following information, which we compare to the Schedule SE for 2010:

| | | |
|---|---:|---:|
| Self-employment income from Thoma & Hjerpe | $69,156 | $63,299 |
| Mr. Thoma's unreimbursed partnership expenses related to Thoma & Hjerpe | (7,396) | (20,867) |
| Mr. Thoma's net farm loss | (4,396) | (1,162) |
| Mr. Thoma's expenses for health insurance[1] | (4,648) | -0- |
| Mr. Thoma's net earnings from self-employment | 52,716 | 41,270 |
| Self-employment tax | 7,448 | 5,069 |

[1]This deduction in arriving at self-employment tax is allowed only for 2010. Sec. 162(l)(4).

Mr. Thoma received $160,000 in quarterly installment payments from Mr. Hjerpe during 2011, which were unrelated to the accounting services that Mr. Thoma rendered to Thoma & Hjerpe in 2011. As with the 2010 return, Mr. and Ms. Thoma attached a Form 6252 and reported that the $160,000 in quarterly installment payments was part of an installment sale of goodwill that had been acquired on October 1, 1976, and sold on December 31, 2018.

As with the Form 6252 for 2010, Part I of the Form 6252 for 2011 was left blank. On line 21 of the Form 6252 for 2011, Mr. and Ms. Thoma reported that the installment sale payments they had received during 2011 totaled $156,079. The Form 6252 for 2011 reported that the gross profit percentage was 84.34%.

[*49] The amount of installment sale payments for 2011 and the gross profit percentage were computed by Mr. Thoma. In short, Mr. Thoma took the table that was attached to the 2010 agreement and modified it. Recall that the table attached to the 2010 agreement listed 20 quarterly installment payments to be made by Mr. Hjerpe to Mr. Thoma in the years 2008, 2009, 2010, 2011, 2012, and 2013. By the time Mr. Thoma prepared the Form 6252 for 2011, Mr. Hjerpe had ceased making quarterly installment payments. The first missed quarterly installment payment was due on January 15, 2012. Mr. Thoma modified the table attached to the 2010 agreement to eliminate the four installment payments due in 2012 and the final installment payment due in 2013. The first 15 installment payments shown on the table attached to the 2010 agreement continued to be shown in the same amounts in the modified table Mr. Thoma used to prepare the 2011 return. However, each installment payment's respective interest and principal components changed as a computational matter. The principal components of the four 2011 installment payments totaled $156,079. This is the amount that Mr. Thoma reported on line 21. The interest components of the four 2011 installment payments totaled $3,921.

Below is the modified table that Mr. Thoma used to prepare the Form 6252 for 2011:

| [*50] | | Date | Payment | Interest | Principal | Balance |
|-------|----|------------|----------|----------|-----------|-----------|
| Loan | | 4/15/2008 | | | | $539,305 |
| | 1 | 4/15/2008 | $32,706 | -0- | $32,706 | 506,600 |
| | 2 | 7/15/2008 | 46,835 | $5,066 | 41,769 | 464,831 |
| | 3 | 10/15/2008 | 24,047 | 4,648 | 19,399 | 445,432 |
| 2008 Totals | | | 103,588 | 9,714 | 93,874 | |
| | 4 | 1/15/2009 | 21,179 | 4,454 | 16,724 | 428,707 |
| | 5 | 4/15/2009 | 40,912 | 4,287 | 36,625 | 392,082 |
| | 6 | 7/15/2009 | 53,362 | 3,921 | 49,441 | 342,641 |
| | 7 | 10/15/2009 | 40,000 | 3,426 | 36,574 | 306,067 |
| 2009 Totals | | | 155,453 | 16,089 | 139,365 | |
| | 8 | 1/15/2010 | 40,000 | 3,061 | 36,939 | 269,128 |
| | 9 | 4/15/2010 | 40,000 | 2,691 | 37,309 | 231,819 |
| | 10 | 7/15/2010 | 40,000 | 2,318 | 37,682 | 194,137 |
| | 11 | 10/15/2010 | 40,000 | 1,941 | 38,059 | 156,079 |
| 2010 Totals | | | 160,000 | 10,012 | 149,988 | |
| | 12 | 1/15/2011 | 40,000 | 1,561 | 38,439 | 117,639 |
| | 13 | 4/15/2011 | 40,000 | 1,176 | 38,824 | 78,816 |
| | 14 | 7/15/2011 | 40,000 | 788 | 39,212 | 39,604 |
| | 15 | 10/15/2011 | 40,000 | 396 | 39,604 | -0- |
| 2011 Totals | | | 160,000 | 3,921 | 156,079 | |
| Grand tot. | | | 579,041 | 39,736 | 539,305 | |

In determining that the gross profit percentage was 84.34%, Mr. Thoma first calculated how much of his $40,000 basis had been used, to determine the income component of the quarterly installment payments in the years 2008, 2009, and 2010. As a result of these calculations, he figured that $24,442 of basis remained at the beginning of 2011. The 84.34% gross profit percentage reported on the Form 6252 for 2011 was equal to ($156,079 − $24,442) ÷ $156,079.

[*51] On the Form 6252 for 2011, Mr. and Ms. Thoma reported $131,637 of income for 2011 from the $156,079 in quarterly installment sale payments received during 2011. To get $131,637, they multiplied $156,079 by 84.34%. They reported the $131,637 as income on the main page of the Form 1040. They also reported that they earned $3,921 of taxable interest on the main page of the Form 1040. They reported that the payments they received in prior years totaled $346,423. The $346,423 reported is equal to the principal components of the quarterly installment payments in 2008, 2009, and 2010, shown in the table attached to the 2010 agreement. The $346,423 is also equal to $211,597 (the payments received in prior years reported on the Form 6252 for 2010) plus $134,826 (the payments received in 2010 reported on the Form 6252 for 2010).

7.    Notice of deficiency

The IRS examined Mr. and Ms. Thoma's joint income-tax returns for tax years 2010 and 2011. Revenue Agent Dana Ransdell conducted the examination.

On March 18, 2013, the IRS issued a 30-day letter to Mr. and Ms. Thoma signed by Marilyn Clark, Supervisory Internal Revenue Agent at the IRS and Ransdell's immediate supervisor. The 30-day letter attached an examination report dated March 18, 2013, and signed by Ransdell. It proposed income-tax deficiencies for 2010 and 2011 and asserted section 6662(a) accuracy-related

**[\*52]** penalties for both years on grounds of: (1) negligence or reckless disregard of rules and regulations or (2) substantial understatements of income tax. The 30-day letter offered Mr. and Ms. Thoma the opportunity to dispute the examination report with the (then-called) IRS Office of Appeals.

On June 4, 2015, the IRS issued a notice of deficiency to Mr. and Ms. Thoma determining that there were underpayments of tax for 2010 and 2011 due to four alternative causes (negligence, a substantial understatement of income tax, a substantial valuation misstatement, or a transaction lacking economic substance) and that Mr. and Ms. Thoma were liable for section 6662(a) accuracy-related penalties for 2010 and 2011. The underpayments are the result of the adjustments described below.

The notice of deficiency determined that the gross profit percentage that should be used in computing Mr. Thoma's income for 2011 from the installment sale was 95.51%. Recall that Mr. and Ms. Thoma reported on their 2011 return that the gross profit percentage was 84.34%. As a result of this change, the notice of deficiency increased capital gains by $2,364 and taxable interest by $15,779 for 2011, and reduced tax-free recovery of basis by $18,143.

[*53] The notice of deficiency also determined that Mr. Thoma was an employee of Thoma & Hjerpe in 2010 and 2011; this determination resulted in the following six adjustments.

First, the notice of deficiency determined that since Mr. Thoma was an employee, the biweekly payments he received in 2010 and 2011 from Thoma & Hjerpe for his accounting services were wages. These payments totaled $69,156 for 2010 and $63,299 for 2011. This recharacterization did not affect Mr. and Ms. Thoma's gross income for income-tax purposes.

Second, the notice of deficiency determined that since Mr. Thoma was an employee, the biweekly payments he received in 2010 and 2011 from Thoma & Hjerpe for his accounting services were not self-employment income. Thus, the notice of deficiency reduced self-employment income as compared to the amounts reported on Schedule SE by $69,156 for 2010 and by $63,299 for 2011, to zero.[14] On the basis of these reductions, Mr. Thoma's self-employment-tax liability was also reduced to zero for both years.

---

[14]We need not determine the correctness of the net farm losses Mr. and Ms. Thoma reported on their Schedules F and Mr. Thoma's Schedules SE, see supra pp. 42, 47-48, because the notice of deficiency did not propose any adjustments to the losses reported and did not determine any corresponding deficiencies.

**[\*54]** <u>Third</u>, the notice of deficiency determined that since Mr. Thoma did not have self-employment-tax liability for 2010 or 2011, Mr. and Ms. Thoma were not entitled to a deduction for one-half of self-employment tax for each year. It disallowed the deductions claimed for one-half of self-employment tax for 2010 and 2011 of $3,724 and $2,915, respectively.

<u>Fourth</u>, the notice of deficiency determined that because Mr. Thoma was an employee of Thoma & Hjerpe in 2010 and 2011, his expenses of working for Thoma & Hjerpe were not expenses paid by a self-employed taxpayer and were not deductions in arriving at AGI. The notice of deficiency determined that Mr. Thoma's expenses of working for Thoma & Hjerpe were deductible only as unreimbursed-employee-business expenses, subject to the 2% of AGI floor for miscellaneous deductions. The notice of deficiency allowed the business expenses as miscellaneous itemized deductions of $7,288 for 2010 and $14,406 for 2011. After taking into account the 2% of AGI floor for miscellaneous itemized deductions, the notice of deficiency determined that deductions for those business expenses should be allowed in the reduced amounts of $1,927 for 2010 and $7,906 for 2011.

<u>Fifth</u>, the notice of deficiency determined that since Mr. Thoma was an employee of Thoma & Hjerpe in 2010 and 2011, his health insurance expenses

[*55] were not expenses paid by a self-employed taxpayer and were not deductible in arriving at AGI. The notice of deficiency disallowed $4,648 and $5,580 in self-employed health insurance deductions claimed for 2010 and 2011, respectively. The notice of deficiency determined that the health insurance expenses were allowable only as itemized deductions for medical and dental expenses, subject to the 7.5% of AGI floor for medical and dental expenses. The notice of deficiency determined that because Mr. and Ms. Thoma's medical and dental expenses did not exceed the 7.5% of AGI floor in 2010 or 2011, they were not entitled to any deduction for the health insurance expenses.

Sixth, the notice of deficiency determined that since Mr. Thoma was an employee of Thoma & Hjerpe in 2010 and 2011, Mr. and Ms. Thoma misreported Mr. Thoma's deductions for contributions to his SIMPLE IRA as contributions from a self-employed taxpayer. The notice of deficiency disallowed the deductions claimed for amounts Mr. Thoma directly deposited into his SIMPLE IRA in 2010 and 2011, in the respective amounts of $15,711 and $14,000.

## OPINION

The taxpayer generally bears the burden of proving that the determinations in the notice of deficiency are erroneous. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). The burden of proof is satisfied by a preponderance of the

[*56] evidence. <u>Estate of Gilford v. Commissioner</u>, 88 T.C. 38, 51 (1987). If the taxpayer shows that the requirements of section 7491(a)(1) and (2) are satisfied for a particular factual issue, then the burden of proof is imposed on the IRS as to that issue. <u>Higbee v. Commissioner</u>, 116 T.C. 438, 442 (2001). Mr. and Ms. Thoma do not argue that the requirements of section 7491(a)(1) and (2) are satisfied, nor does the record show that they are. We hold that the burden does not shift to the IRS as to any factual issue.

I.     <u>Mr. Thoma's self-employment-tax liability for 2010 and 2011</u>

On the 2010 return Mr. and Ms. Thoma reported that Mr. Thoma had net earnings from self-employment of $52,716 and that he was liable for self-employment tax of $7,448, and they claimed a deduction of $3,724 for one-half of Mr. Thoma's self-employment-tax liability.

On the 2011 return Mr. and Ms. Thoma reported that Mr. Thoma had net earnings from self-employment of $41,270 and that he was liable for self-employment tax of $5,069, and they claimed a deduction of $2,915 for one-half of Mr. Thoma's self-employment-tax liability.

The notice of deficiency determined that Mr. Thoma was an employee of Thoma & Hjerpe and, as a consequence, reduced Mr. Thoma's net earnings from self-employment from $52,716 for 2010 and $41,270 for 2011 to zero for both

[*57] years, reduced his self-employment-tax liability from $7,448 for 2010 and $5,069 for 2011 to zero for both years, and disallowed the deductions claimed for one-half of Mr. Thoma's self-employment-tax liability for both years.

The amounts of Mr. and Ms. Thoma's income-tax liabilities are based on their taxable income. See sec. 1(a). Taxable income for taxpayers who itemize deductions (such as Mr. and Ms. Thoma) is equal to AGI (i.e., gross income minus above-the-line deductions) minus itemized deductions and the personal-exemption deduction. Sec. 63(a). AGI is defined as gross income minus certain deductions known as above-the-line deductions. Sec. 62(a). Gross income is defined as all income from whatever source derived. Sec. 61(a). Itemized deductions are deductions other than the deductions allowable in arriving at AGI and the deduction for personal exemptions. Sec. 63(d).

Taxpayers are subject to self-employment tax on their self-employment income during a taxable year, sec. 1401(a), (b)(2), and are allowed to deduct as an above-the-line income-tax deduction (i.e., a deduction in arriving at AGI) an amount equal to one-half of the self-employment tax, sec. 164(f). Self-employment income is generally defined as "the net earnings from self-employment derived by an individual". Sec. 1402(b). "Net earnings from self-employment" are defined as "the gross income derived by an individual from

[*58] any trade or business carried on by such individual, less the deductions allowed by this subtitle which are attributable to such trade or business".[15]  Sec. 1402(a).  The term "trade or business", for purposes of the definition of net earnings from self-employment, has the same meaning as when used in section 162, except that the performance of services by an individual as an employee is not included in the term "trade or business".  Sec. 1402(c)(2).[16]  The term "employee" for purposes of self-employment tax has the same meaning as under the Federal Insurance Contributions Act.  Sec. 1402(d).  Under the Federal Insurance Contributions Act, an "employee" (as relevant here) is "any individual who, under the usual common law rules applicable in determining the employer-employee relationship, has the status of an employee".  Sec. 3121(d)(2).

The term "net earnings from self-employment" generally includes an individual partner's share of partnership income or loss.  Sec. 1402(a).  An

---

[15]For 2010 only, the deduction for the cost of health insurance of self-employed individuals is taken into account in computing "net earnings from self-employment".  Sec. 162(l)(4).

[16]There are several exceptions to the exclusion of the performance of services by an individual as an employee from the term "trade or business", for purposes of the definition of net earnings from self-employment.  See sec. 1402(c).  Mr. and Ms. Thoma's briefs do not argue that an exception applies, and therefore they have waived the argument that an exception under sec. 1402(c) applies for Mr. Thoma for 2010 and 2011.

[*59] individual who is a limited partner generally excludes from net earnings from self-employment his or her share of partnership income or loss, with the exception of guaranteed payments for services actually rendered to or on behalf of the partnership to the extent that the guaranteed payments are established to be in the nature of remuneration for those services.  Sec. 1402(a)(13).

Mr. and Ms. Thoma are entitled to deductions for one-half of Mr. Thoma's self-employment-tax liability for 2010 and 2011 only if the Court does not sustain the determination in the notice of deficiency that Mr. Thoma was an employee of Thoma & Hjerpe in 2010 and 2011 and that the amounts Thoma & Hjerpe paid Mr. Thoma for his accounting services in 2010 and 2011 were wages.[17]

A.    The parties' positions

Mr. and Ms. Thoma's briefs assert that Mr. Thoma and Mr. Hjerpe consistently operated Thoma & Hjerpe as a partnership for federal tax purposes and that they were partners.  According to their briefs, Mr. Hjerpe was a limited partner and Mr. Thoma was the general partner before 2008.  According to Mr. and Ms. Thoma, from 2008 to 2011 Mr. Thoma was the limited partner and Mr. Hjerpe was the general partner.  Mr. and Ms. Thoma's briefs claim that the

---

[17]Mr. and Ms. Thoma's briefs do not argue that Mr. Thoma had self-employment income other than the amounts Thoma & Hjerpe paid him for his accounting services in 2010 and 2011.

[*60] amounts Mr. Thoma received from Thoma & Hjerpe in 2010 and 2011 for his accounting services were guaranteed payments. They therefore assert that Mr. Thoma had net earnings from self-employment and was subject to self-employment tax for 2010 and 2011 under section 1402(a)(13). They conclude that they correctly reported deductions of one-half of Mr. Thoma's self-employment-tax liability on the 2010 and 2011 returns. In support of their claims that Thoma & Hjerpe was a partnership and Mr. Thoma was a limited partner in 2010 and 2011, Mr. and Ms. Thoma argue in their briefs that the IRS is estopped from challenging the manner in which Thoma & Hjerpe reported Mr. Thoma's income to him because the IRS moved for the admission of the 2010 and 2011 Schedules K-1 into evidence.[18] Mr. and Ms. Thoma's briefs point to the Schedules K-1, which stated that the name of the partnership was "Thoma & Hjerpe, CPAs" in

_____

[18]Mr. and Ms. Thoma's opening brief claims that "Respondent argued vehemently that * * * [Mr. Thoma] was not a partner, yet * * * [the IRS] provided as evidence an IRS partnership tax form 'K-1' that was prepared for the partnership of 'Thoma and Hjerpe CPAs'." Their answering brief claims that "[t]he IRS had * * * [the Schedules K-1] admitted as evidence" and "[t]he IRS has used all of these tax form documents and numbers as evidence, on one hand to support their argument that * * * [Mr. Thoma] was not a 'limited partner', and then in the same breath argue that this 'partnership' tax return document is a false document that shouldn't have been prepared by * * * [Mr. Hjerpe]." We construe the claims in Mr. and Ms. Thoma's briefs described above to mean that the IRS is estopped from challenging the correctness of the Schedules K-1 because it introduced the forms in the trial record. As explained infra p. 71 note 24, we reject this estoppel argument.

[*61] Part I, "Information About the Partnership", and that the name of the partner was "Roland Thoma" in Part II, "Information about the Partner". Therefore, Mr. and Ms. Thoma claim, it must be true that Thoma & Hjerpe was a partnership and that Mr. Thoma was a partner in 2010 and 2011. Furthermore, Mr. and Ms. Thoma's briefs claim that "the substance of the work relationship, not the contractual designation determines the worker's status" and that Mr. Thoma and Mr. Hjerpe operated Thoma & Hjerpe as a partnership. But their briefs also claim that Mr. Thoma and Mr. Hjerpe "operated as two separate business under one roof".

Mr. and Ms. Thoma's briefs do not rely on the 2005 agreement in support of their argument that Mr. Thoma was a limited partner of Thoma & Hjerpe in 2010 and 2011. Instead, they argue that the 2010 agreement supports their argument. In particular, they refer to the purchase money security interest provisions of the 2010 agreement we quoted supra p. 19. One provision concerning the purchase money security interest is as follows: "Seller/Employee [Mr. Thoma], so long as Purchaser [Mr. Hjerpe] is not in default under any term of this agreement retains no management, supervisory, or other similar roles with respect to the operation of the business." Their brief proposes that this sentence "means that upon * * * [Mr. Hjerpe's] default * * * [Mr. Thoma] was to immediately become the managing

[*62] partner, basically a role reversal again." They further argue that "[a] non partner couldn't just suddenly become the managing partner." Mr. and Ms. Thoma's briefs also point to the expense-reimbursement provision of the 2010 agreement. See supra p. 22. Their brief proposes that this provision shows that Mr. Thoma could "have a tax deductible loss". We understand this claim to mean that Mr. Thoma was at a risk of loss by working at Thoma & Hjerpe.[19]

Mr. and Ms. Thoma's briefs include an alternative argument to their partnership-partner argument. They claim that even if the Court holds that Mr. Thoma was not a partner in 2010 and 2011, the Court should still conclude that he was an independent contractor. Mr. and Ms. Thoma assert that Mr. Hjerpe did not control the way Mr. Thoma performed his accounting services and that Mr. Thoma did not receive benefits of the type that support employee status. Thus, should the Court hold that Mr. Thoma was not a partner in 2010 and 2011, Mr. and Ms. Thoma's briefs argue that the relationship between Mr. Thoma and Mr. Hjerpe is properly characterized as that of a contracting party and an independent

---

[19]Mr. and Ms. Thoma's briefs argue in particular that "if * * * [Mr. Thoma's] professional licensing fees as a certified public accountant and certified financial planner, and * * * [his] continuing education fees and other business expenses exceeded * * * [his] agreed to maximum reimbursement, then * * * [Mr. Thoma] would have a tax deductible loss."

[*63] contractor.[20]  If Mr. Thoma were indeed an independent contractor in 2010

and 2011, he would have net earnings from self-employment.  See sec. 1402(c)(2)

and (3); Jackson v. Commissioner, 108 T.C. 130, 133-134 (1997).  Mr. and Ms.

Thoma's partnership-partner and independent-contractor arguments reach the

same conclusion, which is that in 2010 and 2011 Mr. Thoma had net earnings

from self-employment, was subject to self-employment tax, and correctly reported

deductions for one-half of his self-employment tax, for 2010 and 2011.

The IRS' briefs argue that Thoma & Hjerpe was not a partnership and that

Mr. Thoma not a partner in 2010 and 2011.  Among other things, the IRS' briefs

claim that the 2005 agreement did not provide that Mr. Thoma and Mr. Hjerpe

were partners, that Mr. Thoma and Mr. Hjerpe's conduct was not that of partners

sharing the profits and losses of Thoma & Hjerpe, and that the 2010 agreement

established that Mr. Thoma was an employee after he and Mr. Hjerpe signed it.

With respect to Mr. and Ms. Thoma's independent-contractor argument, the IRS'

briefs claim that Mr. Hjerpe exercised enough control over Mr. Thoma in 2010

and 2011 for their relationship to be that of an employer and employee.  In

summary, the IRS' briefs argue that Mr. Thoma was an employee in 2010 and

---

[20]Mr. and Ms. Thoma's briefs do not take a position as to what type of entity Thoma & Hjerpe was in 2010 and 2011 (e.g., a sole proprietorship) if the Court were to hold that it was not a partnership.

[*64] 2011, did not have net earnings from self-employment, and consequently was not liable for self-employment tax.  The IRS also argues we should sustain the disallowance in the notice of deficiency of the deductions for one-half of Mr. Thoma's self-employment-tax liability for 2010 and 2011.

We first discuss whether Mr. Thoma carried on a trade or business as a limited partner of a partnership in 2010 and 2011.  We conclude that he did not. We then discuss whether he carried on a trade or business as an independent contractor in 2010 and 2011.  We conclude that he did not.

B.      Analysis:  partnership and partner

Section 761(b) defines a "partner" as a member of a partnership.  Section 761(a) defines a "partnership" as a "syndicate, group, pool, joint venture, or other unincorporated organization through or by means of which any business, financial operation, or venture is carried on, and which is not * * * a corporation or a trust or estate."  Therefore, if Thoma & Hjerpe was not a partnership in 2010 and 2011, then Mr. Thoma did not carry on a trade or business as a limited partner of a partnership.

Federal law controls the question of whether an entity is classified as a partnership for federal tax purposes.  Luna v. Commissioner, 42 T.C. 1067, 1077 (1964).  We must therefore determine whether Thoma & Hjerpe was a bona fide

[*65] partnership in 2010 and 2011 under federal law.[21] A bona fide partnership exists under the Code if the putative partners "really and truly intended to join together for the purpose of carrying on business and sharing in the profits or losses or both." Commissioner v. Tower, 327 U.S. 280, 287 (1946). The following factors are relevant in evaluating whether the putative partners intended to create a partnership for federal-income-tax purposes:

> [1] The agreement of the parties and their conduct in executing its terms; [2] the contributions, if any, which each party has made to the venture; [3] the parties' control over income and capital and the right of each to make withdrawals; [4] whether each party was a principal and coproprietor, sharing a mutual proprietary interest in the net profits and having an obligation to share losses, or whether one party was the agent or employee of the other, receiving for his services contingent compensation in the form of a percentage of income; [5] whether business was conducted in the joint names of the parties; [6] whether the parties filed Federal partnership returns or otherwise represented to respondent [i.e., the IRS] or to persons with whom they dealt that they were joint venturers; [7] whether separate books of account were maintained for the venture; and [8] whether the parties exercised mutual control over and assumed mutual responsibilities for the enterprise.

---

[21]In support of their position that Mr. Thoma was the limited partner of Thoma & Hjerpe in 2010 and 2011, Mr. and Ms. Thoma's briefs claim that "the local licensing and State of Illinois laws should dictate the tax treatment" of Thoma & Hjerpe. We disagree with that claim because we must determine whether Thoma & Hjerpe was a partnership under the Code. See Luna v. Commissioner, 42 T.C. 1067, 1077 (1964).

[*66] <u>Luna v. Commissioner</u>, 42 T.C. at 1077-1078.  No single factor is conclusive as to the existence of a partnership.  <u>Burde v. Commissioner</u>, 352 F.2d 995, 1002 (2d Cir. 1965), <u>aff'g</u> 43 T.C. 252 (1964); <u>McDougal v. Commissioner</u>, 62 T.C. 720, 725 (1974).  We address each factor in turn.

        1.      <u>Agreement governing Thoma & Hjerpe and conduct in executing its terms</u>

The years at issue are 2010 and 2011.  The 2005 agreement arguably governed Thoma & Hjerpe during most of the month of January 2010.  (The 2010 agreement, the preamble of which stated that the 2010 agreement "restated" the 2005 agreement, was not executed until January 28, 2010.)  However, Mr. and Ms. Thoma's briefs do not rely on the 2005 agreement in support of their argument that Thoma & Hjerpe was a partnership, and we therefore do not discuss whether it weighs in favor of Thoma & Hjerpe being a partnership in 2010 and 2011.  Mr. and Ms. Thoma's briefs rely on the security-interest provision of the 2010 agreement[22] for the proposition that Mr. Thoma was a partner, which is related or identical to their contention that Thoma & Hjerpe was a partnership.  The IRS contends that this provision does not support the argument that Mr. Thoma was a

---

[22]Section 2.2 of the 2010 agreement required Mr. Hjerpe to pay Mr. Thoma $679,498 and payment was to be secured by a "first purchase money security interest" against the assets of Thoma & Hjerpe.

[*67] partner. The IRS argues in its briefs that even if Mr. Thoma had a valid purchase money security interest in the assets of Thoma & Hjerpe, at most this meant that Mr. Thoma was a creditor of Mr. Hjerpe, not that Mr. Thoma had a possessory right to the assets secured with the interest. We agree with the IRS that even if the record supported a finding that Mr. Thoma had a valid purchase money security interest in the assets of Thoma & Hjerpe, Mr. Thoma would not have had a possessory right to the assets secured by the interest in 2010 and 2011.

The 2010 agreement weighs against concluding that Thoma & Hjerpe was a partnership because it unambiguously provided that Mr. Thoma was an at-will employee of Mr. Hjerpe, effective 2008. Overall, this factor does not support classifying the relationship between Mr. Hjerpe and Mr. Thoma as a partnership for 2010 and 2011.

### 2. Contributions to Thoma & Hjerpe

Mr. Thoma and Mr. Hjerpe each had their own client groups before they operated Thoma & Hjerpe. They brought over their clients to, and contributed their services to, Thoma & Hjerpe. Mr. and Ms. Thoma's briefs do not argue that there were additional contributions by Mr. Thoma and Mr. Hjerpe to Thoma & Hjerpe, such as contributions of capital. Nor does the trial record show additional contributions, such as contributions of capital provided for under the 2005

[*68] agreement. The 2010 agreement does not provide for contributions of capital. Mr. Thoma's Schedules K-1 for 2010 and 2011 reported no capital contributions during the year and had beginning and ending capital account balances of zero. This factor is neutral.

### 3. Control over income and capital of Thoma & Hjerpe and right to make withdrawals

By 2010 Mr. Thoma did not have any management authority and Mr. Hjerpe controlled the affairs of Thoma & Hjerpe. Mr. and Ms. Thoma's briefs do not argue, and the record does not support a finding, that Mr. Thoma had control over the income and capital of Thoma & Hjerpe, or the right to make withdrawals, in 2010 and 2011. This factor does not support finding a partnership arrangement between Mr. Hjerpe and Mr. Thoma for 2010 and 2011.

### 4. Interest in net profits of Thoma & Hjerpe and obligation to share losses

Mr. Thoma testified that he "was a limited partner with no ownership" in Thoma & Hjerpe during the years at issue. He further testified that he "would not profit if * * * [Thoma & Hjerpe] lost money or made money" and he "would not get a percentage of that profit". He also testified that by the years at issue, he had "removed * * * [his] entire capital account from the firm." All of these statements, in our view, amount to admissions that, by 2010, Mr. Thoma had no interest in the

**[*69]** profits of Thoma & Hjerpe. Thus, we find that by 2010, Mr. Hjerpe was the 100% owner of Thoma & Hjerpe and entitled to all its profits and losses. And we find that Mr. Thoma had no proprietary interest in the profits and losses of Thoma & Hjerpe in 2010 and 2011.

Mr. and Ms. Thoma's briefs contend that Mr. Thoma had to pay professional expenses that could have exceeded the $3,000 that Mr. Hjerpe was obligated to reimburse for professional expenses under the 2010 agreement. (Section 9.5 of the 2010 agreement required Mr. Hjerpe to pay up to $3,000 of Mr. Thoma's dues and educational expenses.) As explained infra part II, pp. 82, 84, Mr. and Ms. Thoma reported that Mr. Thoma paid business expenses for Thoma & Hjerpe of $7,396 in 2010 and $20,867 in 2011. The evidence in the record does not corroborate any of these amounts. The notice of deficiency allowed deductions for these expenses of $7,288 for 2010 and $14,406 for 2011.[23] The IRS is bound to this concession, but there is no independent corroboration of these amounts in the record. We are unable to conclude on this record that Mr. Thoma's payment of professional expenses showed that he shared in the losses of Thoma & Hjerpe.

---

[23]The notice of deficiency determined, however, that the deductions were of a type different from that reported on the returns.

**[\*70]** This factor does not militate in favor of finding that there was a partnership arrangement between Mr. Hjerpe and Mr. Thoma for 2010 and 2011.

     5.     <u>Whether Thoma & Hjerpe was conducted in the joint names of Mr. Thoma and Mr. Hjerpe</u>

During and before the years at issue Mr. Thoma and Mr. Hjerpe held themselves out as operating Thoma & Hjerpe in their joint names.  Several documents in the trial record support this conclusion, such as the letter that Mr. Thoma received from Mr. Hjerpe placing Mr. Thoma on administrative leave. This letter shows Mr. Thoma's name and business email address in the upper left-hand corner of the letterhead and Mr. Hjerpe's name and business email address in the upper right-hand corner of the letterhead.  It shows a logo with both of their last names.  Mr. Hjerpe signed the letter as "Managing Partner".  This factor supports finding a partnership arrangement between Mr. Hjerpe and Mr. Thoma for 2010 and 2011.

     6.     <u>Thoma & Hjerpe federal tax returns; representation of joint venture</u>

The trial record does not contain federal or state partnership returns for Thoma & Hjerpe.  Nor does it contain Schedules K-1 for Mr. Hjerpe.  It contains only the Schedules K-1 issued by Thoma & Hjerpe to Mr. Thoma for 2010 and 2011.  We disagree with Mr. and Ms. Thoma's claim, <u>see</u> <u>supra</u> p. 60, that the

[*71] Schedules K-1 are controlling merely because the IRS introduced them as evidence. The manner in which Thoma & Hjerpe reported Mr. Thoma's income is relevant to one factor under Luna; and even though the Schedules K-1 weigh in favor of the existence of a partnership arrangement, no single factor is conclusive of the existence of a partnership. Burde v. Commissioner, 352 F.2d at 1002; McDougal v. Commissioner, 62 T.C. at 725.[24] Mr. and Ms. Thoma claim on brief that the professional license issued by the State of Illinois (which, according to them, listed Thoma & Hjerpe as a partnership) "alone should be sufficient evidence that the firm of Thoma and Hjerpe CPAs was in fact a partnership, both in name and in practice." Even if the record showed that Thoma & Hjerpe had a professional license that identified it as a partnership in 2010 and 2011, a state-issued professional license alone is not conclusive evidence of a partnership for

---

[24]In support of their contention that the Schedules K-1 are controlling and that therefore Mr. Thoma was a partner in 2010 and 2011, Mr. and Ms. Thoma's briefs claim that Rev. Rul. 69-184, 1969-1 C.B. 256, stands for the proposition that "a limited partner cannot be treated as an employee". Their briefs argue that the notice of deficiency incorrectly determined that Mr. Thoma was an employee because, according to Mr. and Ms. Thoma's briefs, the Schedules K-1 reported that Mr. Thoma was a limited partner and thus he cannot be an employee. As we already discussed supra, the manner in which the Schedules K-1 reported Mr. Thoma's income is relevant to one factor for determining the existence of a partnership, but is not conclusive evidence of a partnership.

[*72] federal tax purposes.  See Luna v. Commissioner, 42 T.C. at 1077.  Overall, this factor is neutral.

### 7. Separate books for Thoma & Hjerpe

The trial record does not contain books and records of Thoma & Hjerpe, such as income statements.  Mr. Thoma offered no testimony as to the contents of Thoma & Hjerpe's books and records.  The trial record does not reveal the names of the account holders for the bank accounts that were used to make biweekly payments to Mr. Thoma or pay the business expenses of Thoma & Hjerpe.  This factor does not support the existence of a partnership arrangement between Mr. Hjerpe and Mr. Thoma for 2010 and 2011.

### 8. Mutual control of, and responsibilities over, Thoma & Hjerpe

In 2010 and 2011 Mr. Hjerpe managed Thoma & Hjerpe; Mr. Thoma was responsible only for providing accounting services to his clients.[25]  At trial Mr. Thoma explained that he and Mr. Hjerpe did not have a "partnership meeting"

---

[25]In its opening brief, the IRS asserts that in 2010 and 2011 "[Mr.] Thoma no longer had managerial or supervisory authority".  Mr. and Ms. Thoma, in their answering brief, do not refute the IRS' assertion that Mr. Thoma had neither managerial nor supervisory authority in 2010 and 2011, but instead they argue that a lack of managerial and supervisory authority is consistent with the definition of a limited partner under Illinois law.  Even if Mr. Thoma's conduct in 2010 and 2011 was consistent with his being a limited partner under Illinois law, federal law governs our analysis.  See Luna v. Commissioner, 42 T.C. at 1077.

[*73] from January 2010 until November 2011. There was no mutual control or mutual responsibilities in 2010 and 2011. Mr. and Ms. Thoma's claim on brief that the work relationship between Mr. Thoma and Mr. Hjerpe was like "two separate business under one roof" weighs against Thoma & Hjerpe being a partnership because such a work arrangement evinces a complete absence of intent to join together for the purposes of carrying on a business and sharing profits and losses. See Commissioner v. Tower, 327 U.S. at 286-287. This factor does not support the existence of a partnership arrangement between Mr. Hjerpe and Mr. Thoma for 2010 and 2011.

Considering the record as a whole, we conclude that in 2010 and 2011 Mr. Thoma and Mr. Hjerpe did not intend to join together for the purpose of carrying on a business, or share in the profits or losses, or both. See id. at 287. Therefore, Thoma & Hjerpe was not a partnership under federal law in 2010 and 2011. Consequently, Mr. Thoma did not carry on a trade or business as a limited partner of a partnership in 2010 and 2011. See sec. 1402(b)(2), (a), (c); sec. 1.1402(c)-1, Income Tax Regs.[26] Thus, Mr. Thoma did not receive guaranteed payments

---

[26]Mr. and Ms. Thoma's post-trial briefs rely on Exhibit 12-P for their argument that the relationship between Mr. Thoma and Mr. Hjerpe was that of partners in 2010 and 2011. They argue that the Court must reverse its decision as to the admission of Exhibit 12-P. We see no grounds for revisiting our ruling on

(continued...)

**[\*74]** subject to self-employment tax as reported on the returns at issue.  See sec. 1402(a)(13).

Next, we discuss whether the relationship between Mr. Thoma and Mr. Hjerpe in 2010 and 2011 was that of an employee and employer, as the notice of deficiency determined, or Mr. Thoma was an independent contractor, as Mr. and Ms. Thoma assert on brief.  Because Mr. and Ms. Thoma do not carry their burden of proving that Mr. Thoma was an independent contractor in the years at issue, we sustain the notice of deficiency's determination that he was an employee.

C.    Analysis:  employee or independent contractor

In general, a taxpayer does not have income from self-employment for compensation earned from the performance of services as an employee and is not subject to self-employment tax on such compensation.  See supra p. 58.  Section 1402(d) defines the term "employee" as having the same meaning as under the Federal Insurance Contributions Act.  The definition of "employee" under the Federal Insurance Contributions Act has been held to be identical to the common-law definition of employee.  Simpson v. Commissioner, 64 T.C. 974, 984 (1975); Pariani v. Commissioner, T.C. Memo. 1997-427, slip op. at 9.  Consequently, we

_____

[26](...continued)
the admissibility of Exhibit 12-P, and we do not rely on the exhibit in reaching our holdings.

[*75] apply common law rules to determine whether a worker is an employee under section 1402(d). See sec. 3121(d)(2); Prof'l & Exec. Leasing, Inc. v. Commissioner, 89 T.C. 225, 231 (1987), aff'd, 862 F.2d 751 (9th Cir. 1988); Simpson v. Commissioner, 64 T.C. at 984. Whether a worker is an employee is a factual question. Weber v. Commissioner, 103 T.C. 378, 386 (1994), aff'd per curiam, 60 F.3d 1104 (4th Cir. 1995). We generally consider several factors in making this determination: (1) whether the relationship between the worker and the one to whom the worker provides services (i.e., the principal) was permanent; (2) whether the worker had an opportunity for profit or loss; (3) whether the principal had the right to discharge the worker; (4) whether the principal or the worker invested in the facilities the worker used; (5) whether the work was part of the principal's regular business; (6) whether the principal could exercise control over the details of the work; and (7) whether the worker and the principal believed that they were creating an employment relationship. Id. at 387. No one factor is determinative; we look at all relevant facts. Id.

Four of the above-listed factors weigh strongly in favor of the conclusion that Mr. Thoma was an employee in 2010 and 2011.

1. Permanency of the relationship. The relationship between Mr. Thoma and Thoma & Hjerpe was ultimately not permanent, given that Mr. Hjerpe caused

**[\*76]** Mr. Thoma to part ways with Thoma & Hjerpe in November 2011. Yet we find that the relationship was more permanent than that of an independent contractor. Mr. Thoma had worked for Thoma & Hjerpe for many years. The relationship, which ended only with the falling out in November 2011, was as permanent as any other employment relationship.

2. Right to discharge. On November 21, 2011, Mr. Hjerpe, on behalf of Thoma & Hjerpe, exercised his right to discharge Mr. Thoma from Thoma & Hjerpe.

3. Principal's investment in the facilities. In 2010 and 2011 Thoma & Hjerpe provided Mr. Thoma with professional liability insurance, office space on its business premises, and tax preparation software. Mr. Thoma did not have any investment in Thoma & Hjerpe. See supra pp. 67-68.

4. Part of the principal's regular work. In 2010 and 2011 Thoma & Hjerpe was in the business of accounting, and the work Mr. Thoma performed for his clients in 2010 and 2011 was within the scope of Thoma & Hjerpe's regular business.

We now explain why the remaining three factors also support (although less strongly) the conclusion that Mr. Thoma was an employee in 2010 and 2011.

[*77] 5. <u>Opportunity for profit or loss</u>. If Mr. Thoma had increased his efforts and billed more hours in 2010 and 2011, then his biweekly payments from Thoma & Hjerpe would have been greater. This seems to indicate he had an opportunity for profit. However, Mr. Thoma received his biweekly payments regardless of whether his clients paid Thoma & Hjerpe. Furthermore, his biweekly payments were calculated by multiplying each hour he billed a client by 40% of his $170 standard billing rate. This is similar to an hourly wage, which indicates he was an employee. See <u>James v. Commissioner</u>, 25 T.C. 1296, 1300 (1956).

6. <u>Control over details of the work</u>. Mr. and Ms. Thoma claim in their briefs that Mr. Hjerpe did not control or review Mr. Thoma's work for his clients. They further claim that Mr. Thoma and Mr. Hjerpe operated independently of each other. The amount of control required to find an employer-employee relationship varies by occupation. <u>United States v. W.M. Webb, Inc.</u>, 397 U.S. 179, 192-193 (1970). The level of control necessary to find employee status is in most circumstances lower for professional services than for nonprofessional services. <u>Azad v. United States</u>, 388 F.2d 74, 77 (8th Cir. 1968); <u>Prof'l & Exec. Leasing, Inc. v. Commissioner</u>, 89 T.C. at 234. "From the very nature of the services rendered by * * * professionals, it would be wholly unrealistic to suggest that an employer should undertake the task of controlling the manner in which the

[*78] professional conducts his activities." Azad, 388 F.2d at 77; Weber v. Commissioner, 103 T.C. at 388. Mr. Thoma was a professional who had performed accounting services for his clients for many years and was likely more familiar with them than Mr. Hjerpe. It was not necessary for Mr. Hjerpe to oversee when and how Mr. Thoma performed accounting services for his clients. See Azad, 388 F.2d at 77; Weber v. Commissioner, 103 T.C. at 388.

     7. Belief about creation of employment relationship. Mr. and Ms. Thoma claim that Mr. Hjerpe did not treat Mr Thoma like an employee. We agree, see supra p. 29, with their assertion on brief that Mr. Thoma did not receive paid time off and paid sick days. We do not, however, agree with their claim that Exhibit 10-J, which consists of a table showing time off and sick days, "clearly shows [Mr. Thoma] was not employee". This is because the overall evidence in the record supports a conclusion that Mr. Thoma was treated as an employee in 2010 and 2011.

     An employer usually withholds federal (and state) income tax and employment taxes from employees' wages. No taxes or amounts for contributions to Mr. Thoma's SIMPLE IRA were withheld in 2010 and 2011 from the biweekly payments he received for his accounting services. This can be indicative of independent contractor status. See Packard v. Commissioner, 63 T.C. 621, 632

**[\*79]** (1975) ("But in this case the payment of salaries, insurance benefits, and withholding of taxes by the corporation on behalf of the employees in question gives a clear indication that they were employees of the corporation and those factors must be given considerable weight." (Emphasis added.)). Any favorable weight accorded to the fact that no taxes were withheld from Mr. Thoma's biweekly payments is negated by Mr. Thoma's own representations that he was an employee in his application for unemployment benefits and in his complaint against Mr. Hjerpe seeking compensation for wage income.

On the basis of all the evidence in the record, we conclude that Mr. Thoma was not an independent contractor in 2010 and 2011. Consequently, Mr. Thoma did not carry on a trade or business as an individual, did not have income from self-employment as an independent contractor, and was not liable for self-employment tax. See secs. 1402(a) and (b), 1401(a); sec. 1.1402(c)-1, Income Tax Regs. We sustain the determination in the notice of deficiency that Mr. Thoma was an employee in 2010 and 2011, and we sustain the following related determinations:

- increases to wage income for Mr. Thoma by $69,156 for 2010 and by $63,299 for 2011; and corresponding reductions in the nonwage income

[*80] reported in identical amounts on the 2010 and 2011 Schedules E for Thoma & Hjerpe;

- decreases to self-employment income by $69,156 and $63,299, reported on Mr. Thoma's 2010 and 2011 Schedules SE, respectively;

- disallowance of deductions of $3,724 for 2010 and $2,915 for 2011 for one-half of Mr. Thoma's self-employment tax.

We discussed supra Mr. Thoma's income from Thoma & Hjerpe. We next discuss infra the business expenses that Mr. Thoma paid in working for Thoma & Hjerpe in 2010 and 2011.

II.    Mr. Thoma's business expenses

An individual taxpayer's income-tax liability depends on the taxpayer's taxable income. Sec. 1(a)-(d). Taxable income is equal to gross income (defined as "all income" from whatever source derived) minus deductions. Secs. 61, 63. Section 162(a) allows a deduction for the expenses of carrying on a trade or business. A business for this purpose includes the business of providing services as an employee. Lucas v. Commissioner, 79 T.C. 1, 6 (1982). Thus, the expenses of performing services as an employee are deductible under section 162(a). Primuth v. Commissioner, 54 T.C. 374, 377-378 (1970). A business can also include providing services as a nonemployee. Feaster v. Commissioner, T.C.

**[*81]** Memo. 2010-157, slip op. at 5. A person providing services as a nonemployee can deduct the related expenses. Id.

While various items are deducted in arriving at taxable income, some other items are deducted in arriving at AGI. Sec. 62(a). These deductions are known as above-the-line deductions. See Cutler v. Commissioner, T.C. Memo. 2015-73, at *5. One type of deduction in arriving at AGI is the deduction attributable to carrying on a trade or business other than the performance of services as an employee. Sec. 62(a)(1).

Itemized deductions are deductions made in arriving at taxable income but not AGI. Sec. 63(d). One type of itemized deduction is the deduction for the expense of performing services as an employee. This type of deduction is referred to as an employee-business-expense deduction.

A subset of itemized deductions is miscellaneous itemized deductions. Sec. 67(b). The employee-business-expense deduction is a miscellaneous itemized deduction. Secs. 67(b), 63(d)(1), 62. Miscellaneous itemized deductions are allowable only to the extent that the total of such deductions exceeds 2% of AGI. Sec. 67(a) and (b).

AGI is incorporated into rules that limit the amounts of certain deductions in arriving at taxable income. An example is the 2% of AGI floor for

[*82] miscellaneous itemized deductions mentioned above. Sec. 67(a). Another example is medical and dental expenses, which are deductible only to the extent that they exceed 7.5% of AGI. Sec. 213(a).

Mr. and Ms. Thoma reported the expenses of Mr. Thoma's work for Thoma & Hjerpe as losses of $7,396 and $20,867 on their Schedules E for 2010 and 2011, respectively. They reduced their reported gross income for each year by these amounts. Thus, their computations of AGI reflected reductions for these amounts. Mathematically, this reporting would be consistent with the amounts being deductions in arriving at AGI. Indeed, Mr. and Ms. Thoma contend that these amounts should be treated as such.

The notice of deficiency determined that Mr. Thoma was an employee of Thoma & Hjerpe in 2010 and 2011. Consequently, the notice of deficiency determined that Mr. Thoma's expenses of working for Thoma & Hjerpe were deductible only as employee-business expenses, which are a type of miscellaneous itemized deduction, and not a deduction in arriving at AGI. The notice of deficiency also determined that the amounts of the deductions were $7,288 for 2010 and $14,406 for 2011, before application of the 2% of AGI floor for miscellaneous itemized deductions.

**[*83]** We hold <u>infra</u> part II.A, p. 83, that Mr. Thoma's expenses of working for Thoma & Hjerpe are deductible only as employee-business expenses, and not as deductions in arriving at AGI. We explain <u>infra</u> part II.B, pp. 83-87, that the deductible amounts of Mr. Thoma's expenses of working for Thoma & Hjerpe are those amounts determined in the notice of deficiency.

A. <u>Mr. Thoma's expenses of working for Thoma & Hjerpe are deductible only as employee-business expenses</u>.

Mr. and Ms. Thoma argue that Mr. Thoma worked for Thoma & Hjerpe in 2010 and 2011 as a self-employed partner or independent contractor, and therefore the deductions for the expenses of Mr. Thoma's work for Thoma & Hjerpe are deductions in arriving at AGI, rather than employee-business-expense deductions. But we held <u>supra</u> part I, p. 79, that Mr. Thoma was an employee of Thoma & Hjerpe in 2010 and 2011. Therefore, Mr. Thoma's expenses of working for Thoma & Hjerpe are not deductible in arriving at adjusted gross income, but rather deductible only as employee-business expenses.

B. <u>The deductible amounts of Mr. Thoma's expenses of working for Thoma & Hjerpe are those determined in the notice of deficiency</u>.

We hold that Mr. and Ms. Thoma are entitled to deductions for employee-business expenses of $7,288 for 2010 and $14,406 for 2011, as determined in the notice of deficiency. We explain below.

[*84] For 2010 Mr. and Ms. Thoma claimed a $7,396 deduction that affected AGI for Mr. Thoma's expenses of working for Thoma & Hjerpe. The notice of deficiency disallowed the deduction as a deduction in arriving at AGI and instead allowed $7,288 in employee-business-expense deductions, before application of the 2% of AGI floor for miscellaneous itemized deductions. The difference between $7,396 and $7,288 is $108. Mr. and Ms. Thoma argue that (1) Mr. Thoma paid $108 for internet access and that (2) Mr. Thoma regularly conducted internet research to provide his accounting services. However, neither of these claims is supported by evidence. Mr. and Ms. Thoma have failed to carry their burden of proof regarding the $108 deduction they seek.[27]

For 2011 Mr. and Ms. Thoma claimed a $20,867 deduction that affected AGI for Mr. Thoma's expenses of working for Thoma & Hjerpe. The notice of deficiency disallowed the deduction as a deduction in arriving at AGI and instead allowed $14,406 in employee-business-expense deductions, before application of the 2% of AGI floor for miscellaneous itemized deductions. The difference between $20,867 and $14,406 is $6,461.

---

[27]We need not reach the issue of whether the $108 deduction sought by Mr. and Ms. Thoma was already allowed in the notice of deficiency as part of the $7,288 employee-business-expense deduction.

[*85] Mr. and Ms. Thoma argue that they are entitled to deduct $5,000 for an event Mr. Thoma held on December 28, 2011. Mr. and Ms. Thoma characterize this expense as an advertising expense and argue that the event was a "meeting" of Mr. Thoma's "business associates, attorneys, and bankers" to inform them of Mr. Thoma's falling out with Mr. Hjerpe and to "explain * * * [Mr. Thoma's] business plans". The record contains an invoice from the Bloomington Country Club to Mr. Thoma for a $5,805 "Celebration of Life" event that occurred on December 28, 2011. The invoice does not state whose life was being celebrated. The invoice shows that the $5,805 figure was composed of $2,750 for food, $1,359 for bar, $200 for room, $210 for piano player, $822 for surcharge, and $464 for sales tax. A document accompanying this invoice shows that $5,000 of the $5,805 invoiced was paid on December 29, 2011. The record also includes a list of approximately 120 guests who attended the event. Mr. and Ms. Thoma did not testify during the trial about this event.

The IRS does not contest that Mr. Thoma paid the $5,000 expense for the event, but contends that Mr. and Ms. Thoma have not proven that it is a deductible business expense. The IRS states that the notice of deficiency did not allow the $5,000 as an employee-business-expense deduction.

[*86] Theoretically, a big event at a country club could serve a business purpose, and its cost could constitute a business-expense deduction. But on this record we have trouble concluding that the December 28, 2011 event was a business meeting. At the time, Mr. Thoma was professionally separated from Thoma & Hjerpe. We do not know whether the event was designed to help Mr. Thoma rejoin Thoma & Hjerpe, start his own business, or simply entertain his friends. Mr. and Ms. Thoma have the burden of proving that the expense was a business expense, rather than a personal one. They have failed to satisfy that burden of proof.

Mr. and Ms. Thoma also argue that they are entitled to deduct $200 for telephone expenses, $62 for travel expenses, and $1,199 for supplies and miscellaneous items. However, there is no evidence, testimonial or documentary, regarding these expenses. They have failed to carry their burden of proving entitlement to such deductions.[28]

For the reasons stated above, we sustain the allowance in the notice of deficiency of unreimbursed employee expense deductions for Mr. Thoma of $7,288 for 2010 and $14,406 for 2011. Mr. and Ms. Thoma are not entitled to

---

[28]We need not reach the issue of whether these deduction were already allowed in the notice of deficiency as part of the $14,406 employee-business-expense deduction.

[*87] deduct unreimbursed employee expenses in excess of the amounts determined in the notice of deficiency.

III.     Mr. Thoma's health insurance expenses

Mr. and Ms. Thoma claimed deductions for health insurance expenses for Mr. Thoma, on line 29, of $4,648 for 2010 and $5,580 for 2011.  These deductions were based on the treatment of Mr. Thoma as a self-employed individual, and consequently Mr. and Ms. Thoma did not treat the expenses as subject to the 7.5% of AGI floor for medical expense deductions.  The notice of deficiency determined that Mr. Thoma was an employee of Thoma & Hjerpe and consequently disallowed the self-employed health insurance deductions for both years.  On brief, Mr. and Ms. Thoma's sole argument for the deduction is that Mr. Thoma was self-employed in 2010 and 2011 and that the returns correctly claimed the deductions.  An individual who is self-employed is generally entitled to a deduction in arriving at AGI for amounts paid during the taxable year for health insurance.  Secs. 62(a)(1), 162(l).  We held supra part I, p. 79, that Mr. Thoma was an employee of Thoma & Hjerpe in 2010 and 2011 and not self-employed.  Accordingly, we sustain the disallowance in the notice of deficiency of deductions of $4,648 for 2010 and $5,580 for 2011 for Mr. Thoma's health insurance expenses as deductions of a self-employed individual.

[*88] The notice of deficiency determined that the amounts were allowable instead as itemized deductions for medical expenses for 2010 and 2011. No dispute exists as to the amounts--$4,648 for 2010 and $5,580 for 2011. We sustain the allowance of itemized deductions for medical expenses of $4,648 for 2010 and $5,580 for 2011, subject to the 7.5% of AGI floor. See sec. 213(a). Mr. and Ms. Thoma are entitled to deductions for the health insurance expenses as itemized deductions to the extent the expenses exceed the 7.5% of AGI floor for each year.[29]

IV.   Mr. Thoma's SIMPLE IRA contributions

Mr. and Ms. Thoma's returns claimed deductions on line 28 of $15,271 for 2010 and $14,000 for 2011, for amounts Mr. Thoma directly deposited into his SIMPLE IRA. Their claims were based on their position that Mr. Thoma was self-employed as a partner of Thoma & Hjerpe in 2010 and 2011. The notice of deficiency determined that Mr. Thoma was an employee of Thoma & Hjerpe in 2010 and 2011 and on that basis disallowed the deductions claimed on line 28 for both years.

---

[29]However, taking into account our other holdings, it does not appear that the medical and dental expenses exceed the 7.5% of AGI floor for each year.

[*89] Mr. and Ms. Thoma's main argument with respect to the SIMPLE IRA contribution deductions is that Mr. Thoma was self-employed in 2010 and 2011 (either as a partner of Thoma & Hjerpe, or alternatively, as an independent contractor[30] of Thoma & Hjerpe) and that therefore the "amounts * * * [Mr. Thoma] paid * * * [to his SIMPLE IRA] were fully within the parameters under the IRS regulations." On brief the IRS asserts that if Mr. Thoma was an employee of Thoma & Hjerpe, he is not entitled to a deduction for the contributions to his SIMPLE IRA. Mr. and Ms. Thoma do not disagree. As explained supra part I, pp. 56-79, Mr. Thoma was an employee of Thoma & Hjerpe in 2010 and 2011.

We hold that Mr. and Ms. Thoma are not entitled to deductions for the amounts Mr. Thoma directly deposited into his SIMPLE IRA for 2010 and 2011 as deductions of a self-employed individual.

---

[30]On brief the IRS argues that only if the Court holds Mr. Thoma was a partner in 2010 and 2011 are Mr. and Ms. Thoma entitled to deductions for Mr. Thoma's SIMPLE IRA contributions. The IRS further claims on brief that if the Court holds Mr. Thoma was an independent contractor, then Mr. and Ms. Thoma are not entitled to the deductions. We sustained supra part I, p. 79, the determination in the notice of deficiency that Mr. Thoma was an employee of Thoma & Hjerpe in 2010 and 2011. Therefore, we need not discuss in greater detail the IRS' argument concerning Mr. Thoma's SIMPLE IRA contributions under a view that Mr. Thoma was self-employed as a partner or an independent contractor.

**[*90]** V.     Quarterly installment payments during 2011 for the sale of Mr. Thoma's interest in Thoma & Hjerpe

It is undisputed that Mr. Thoma received installment payments from Mr. Hjerpe for Mr. Thoma's interest in Thoma & Hjerpe in 2008, 2009, 2010, and 2011.  It is further undisputed that Mr. Thoma sold his entire ownership interest in Thoma & Hjerpe to Mr. Hjerpe in 2008.  One confusing aspect of Mr. Thoma's sale of his entire ownership interest in Thoma & Hjerpe is that the record is unclear as to what Mr. Thoma's interest was before he sold it in 2008.  Mr. and Ms. Thoma's briefs are inconsistent on the subject.  In one part they describe the ownership interest sale to Mr. Hjerpe as "the installment sale of * * * [Mr. Thoma's] business", which suggests the view that Mr. Thoma was the sole owner of Thoma & Hjerpe before selling it to Mr. Hjerpe in 2008.  But in other parts they assert that Thoma & Hjerpe was a partnership during its entire existence (from 2006 or 2007 through November 2011) and Mr. Thoma was always one of its two partners.  If their assertions that Thoma & Hjerpe had been a partnership since its formation and Mr. Thoma was a partner are true, then Mr. Thoma would have had a partnership interest to sell to Mr. Hjerpe in 2008.  We need not determine Mr. Thoma's ownership interest (i.e., 100% or less than 100%) in Thoma & Hjerpe

[*91] before he sold it to Mr. Hjerpe in 2008.  That is because in 2010 and 2011,

the years before us, Mr. Thoma had no ownership interest in Thoma & Hjerpe.

Mr. and Ms. Thoma reported the installment payments using the installment

method for all years, and the IRS agrees that the method of reporting the income

from Mr. Thoma's sale was the installment method.  See supra pp. 43-45 for

discussion of the Form 6252 for 2010 and pp. 48-51 for discussion of the Form

6252 for 2011.  In general, the term "installment sale" means "a disposition of

property where at least 1 payment is to be received after the close of the taxable

year in which the disposition occurs."  Sec. 453(b)(1).  "[I]ncome from an

installment sale shall be taken into account for purposes of this title under the

installment method."  Sec. 453(a).  The term "installment method" means "a

method under which the income recognized for any taxable year from a disposition

is that proportion of the payments received in that year which the gross profit

(realized or to be realized when payment is completed) bears to the total contract

price."  Sec. 453(c).  The gross profit is equal to the contract price less adjusted

basis.  Sec. 15A.453-1(b)(2)(v), Temporary Income Tax Regs., 46 Fed. Reg.

10710 (Feb. 4, 1981).  Interest is not part of the gross profit, and it is excluded

from the selling price, the contract price, and the installment sale payment.  Id.

subdiv. (ii), 46 Fed. Reg. 10709.  The gross profit (realized or to be realized when

[*92] payment is completed) divided by the total contract price is also referred to as the gross profit percentage. The income for the year is equal to the payments received in that year multiplied by the gross profit percentage. Sec. 453(c); sec. 15A.453-1(b)(2)(i), Temporary Income Tax Regs., supra.

Mr. and Ms. Thoma reported on Form 6252 the income from the $160,000 in installment payments that Mr. Hjerpe made in 2011. They reported that the $160,000 was composed of $131,637 in long-term capital gain, $3,921 in taxable interest, and $24,442 in tax-free recovery of basis. The Form 6252 for 2011 stated that the gross profit percentage was 84.34%. (The 2010 Form 6252 stated that the gross profit percentage was 95.51%.) Mr. Thoma used the modified table to report the installment income for 2011.

The notice of deficiency determined that the gross profit percentage to be used in computing the income from the 2011 installment payments was 95.51%, and correspondingly increased capital gains for 2011 by $2,364 and taxable interest for 2011 by $15,779. The notice of deficiency determined that for 2011, $140,300 of the installment payments was the noninterest component and $19,700 was the interest component. According to the notice of deficiency, Mr. and Ms. Thoma would recover only $6,299 of tax-free basis for 2011, $140,300 − ($140,300 x 95.51%). Thus, the amounts as determined by the notice of

[*93] deficiency for principal and interest for the 2011 installment payments are the same as the table attached to the 2010 agreement showed for 2011 (of the $160,000 in installment payments, $140,300 was principal and $19,700 was interest). See supra p. 25.

Mr. and Ms. Thoma argue in their opening brief that the gross profit percentage for 2011 was 84.34%. They assert that when Mr. Thoma prepared the 2011 return in October 2012, he believed Mr. Hjerpe would not make the quarterly installment payments for 2012 by the time he prepared the 2011 return, or the final quarterly installment payment due in 2013. (Recall that on or about January 23, 2012, Mr. Thoma filed a lawsuit against Mr Hjerpe for his failure to pay the quarterly installment payment due on January 15, 2012.) In their opening brief, Mr. and Ms. Thoma claim that they are allowed to recover the remaining amount of the $40,000 basis with the installment payments for 2011. According to Mr. and Ms. Thoma, a taxpayer is allowed to adjust the gross profit percentage when an "intervening event" occurs. They point to section 15A.453-1(c)(2)(i)(A), Temporary Income Tax Regs., 46 Fed. Reg. 10712 (Feb. 4, 1981), in support of their claim. However, this regulation pertains to "contingent payment sales". A "contingent payment sale" is defined as "a sale or other disposition of property in which the aggregate selling price cannot be determined by the close of the taxable

[*94] year in which such sale or other disposition occurs." Id. subpara. (1), 46 Fed. Reg. 10711. Mr. and Ms. Thoma do not argue in their opening brief that Mr. Thoma's sale of his ownership interest in Thoma & Hjerpe to Mr. Hjerpe was a contingent payment sale. Nor did Mr. Thoma testify that his sale was a contingent payment sale. In any event, Mr. Thoma's sale of his ownership interest in Thoma & Hjerpe could not have been a contingent payment sale because the selling price could be, and in fact was, determined by the close of the taxable year in which the sale occurred. The total selling price of $1 million was clearly stated in the 2010 agreement.

Although Mr. and Ms. Thoma claim in their opening brief that the gross profit percentage for 2011 was properly recalculated, they concede the adjustments in the notice of deficiency for long-term capital gains and taxable interest for 2011 in their answering brief. In their answering brief, they assert that Mr. Thoma received the "full payments on * * * [his] contract" from Mr. Hjerpe. We therefore sustain the determination in the notice of deficiency and hold that for 2011 Mr. and Ms. Thoma underreported long-term capital gains by $2,364 and taxable interest by $15,779. (We discuss infra part VI.C.3, pp. 103-104, whether Mr. and Ms. Thoma had reasonable cause and acted in good faith for the way they reported the installment sale payments.)

**[*95]** VI.    Accuracy-related penalties

The IRS takes the position that Mr. and Ms. Thoma are liable for the 20%

accuracy-related penalty under section 6662(a) for 2010 because the

underpayment of tax for that year is attributable to negligence, one of the causes

set forth in section 6662(b).  See sec. 6662(b)(1).[31]  The IRS takes the position that

Mr. and Ms. Thoma are liable for the 20% accuracy-related penalty under section

6662(a) for 2011 because the underpayment of tax for that year is attributable to

two of the causes set forth in section 6662(b):  negligence or, alternatively, a

substantial understatement of income tax.  See sec. 6662(b)(1) and (2).[32]

Section 6662(a) imposes a 20% penalty on the portion of an underpayment

of tax that is attributable to negligence, or to a substantial understatement of

income tax, or to various other causes.  Sec. 6662(b).  An understatement of tax is

generally the difference between the correct tax and the tax reported on the return.

---

[31]The notice of deficiency determined that the underpayment of tax for 2010 is attributable to one or more of four causes.  See supra p. 52.  In its briefs the IRS does not take the position that the underpayment of tax for 2010 is attributable to a cause other than negligence.  We therefore discuss only negligence for 2010.

[32]The notice of deficiency determined that the underpayment of tax for 2011 is attributable to one or more of four causes.  See supra p. 52.  In its briefs the IRS does not take the position that the underpayment of tax for 2011 is attributable to causes other than negligence and a substantial understatement.  We therefore discuss only negligence and a substantial understatement for 2011.

**[\*96]** Sec. 6662(d)(2)(A).  Negligence includes any failure to make a reasonable attempt to comply with the tax laws.  Sec. 6662(c); sec. 1.6662-3(b), Income Tax Regs.  Negligence is strongly indicated where a taxpayer fails to make a reasonable attempt to determine the correctness of a deduction, credit, or exclusion that would seem to a reasonable person to be "too good to be true".  Sec. 1.6662-3(b)(1)(ii), Income Tax Regs.  Negligence also includes a failure to maintain accurate records or to substantiate items properly.  Sec. 1.6662-3(b)(1), Income Tax Regs.  An understatement is substantial if it exceeds the greater of "(i) 10 percent of the tax required to be shown on the return for the taxable year, or (ii) $5,000."  Sec. 6662(d)(1)(A).[33]

The IRS has the burden of producing evidence that it is appropriate to impose the penalty.  Sec. 7491(c); <u>Higbee v. Commissioner</u>, 116 T.C. at 446.[34]

___

[33]An understatement is reduced, however, by the portion attributable to the treatment of any item for which the taxpayer had "substantial authority" or disclosed the relevant facts and had a reasonable basis.  Sec. 6662(d)(2)(B).  In their briefs Mr. and Ms. Thoma do not argue that the understatement of tax for 2011 should be reduced because of substantial authority or disclosure and reasonable basis.  They have waived any argument that the understatement of tax for 2011 should be reduced under sec. 6662(d)(2)(B).

[34]The section 6662(a) accuracy-related penalty can be imposed only if the initial determination to assess the penalty is personally approved by the immediate supervisor of the individual making the determination.  Sec. 6751(b); see <u>Graev v. Commissioner</u>, 149 T.C. 485, 493 (2017), <u>supplementing and overruling in part</u>

(continued...)

**[\*97]** A.     <u>Underpayment of tax for 2010</u>

For the reasons stated below, we find the IRS has met its burden of showing that the underpayment of tax for 2010 is attributable to negligence.  Mr. and Ms. Thoma were negligent with respect to the portion of the underpayment of tax for

---

[34](...continued)
147 T.C. 460 (2016).  Written supervisory approval of the initial penalty determination under sec. 6751(b)(1) must be obtained before the first formal communication to the taxpayer proposing the penalty and advising the taxpayer of his right to appeal the penalty with the IRS Office of Appeals.  <u>Clay v. Commissioner</u>, 152 T.C. 223, 249 (2019).  In <u>Belair Woods, LLC v. Commissioner</u>, 154 T.C. __, __ (slip op. at 24-25) (Jan. 6, 2020), we recently held that "the 'initial determination' of a penalty assessment * * * is embodied in the document by which the Examination Division formally notifies the taxpayer, in writing, that it has completed its work and made an unequivocal decision to assert penalties."  Compliance with sec. 6751(b)(1) is part of the IRS' initial burden of production in any deficiency case in which a penalty subject to sec. 6751(b)(1) is asserted.  <u>Chai v. Commissioner</u>, 851 F.3d 190, 221 (2d Cir. 2017), <u>aff'g in part, rev'g in part</u> T.C. Memo. 2015-42; <u>Frost v. Commissioner</u>, 154 T.C. __, __ (slip op. at 16) (Jan. 7, 2020).  If the IRS meets its initial burden of production, then "the taxpayer must come forward with contrary evidence."  <u>Frost v. Commissioner</u>, 154 T.C. at __ (slip op. at 20).  RA Ransdell made the initial determination to impose the sec. 6662(a) penalties in her examination report.  The examination report was attached to a 30-day letter sent to Mr. and Ms. Thoma.  The 30-day letter was signed by RA Ransdell's immediate supervisor, Marilyn Clark.  The IRS has met its initial burden of production of showing that the initial determination to impose the sec. 6662(a) penalties was approved in writing before Mr. and Ms. Thoma received the first formal communication informing them of the penalties and giving them an opportunity to dispute the penalties with the IRS Office of Appeals.  Mr. and Ms. Thoma have not offered any contrary evidence (e.g., a prior formal communication).  Accordingly, we hold that the IRS complied with the sec. 6751(b)(1) procedural requirements for imposition of the sec. 6662(a) accuracy-related penalties.

[*98] 2010 that is attributable to the partially disallowed business-expense deduction because, despite his long career as an accountant, Mr. Thoma did not maintain adequate records to substantiate the partially disallowed amounts for 2010. See sec. 6001; secs. 1.6001-1(a), 1.6662-3(b)(1), Income Tax Regs. Mr. and Ms. Thoma reported that Mr. Thoma was a partner in an entity, but he did not share in its profits and losses, did not have any responsibility for its debts, and had no equity investment in the entity. They should have realized it was too good to be true that they could report Mr. Thoma as a partner when Mr. Hjerpe had authority to terminate Mr. Thoma's business relationship with Thoma & Hjerpe. See sec. 1.6662-3(b)(1)(ii), Income Tax Regs. Because Mr. and Ms. Thoma were negligent as to Mr. Thoma's employee status in 2010, they were negligent in reporting deductions for business expenses, health insurance expenses, SIMPLE IRA contributions, and one-half of self-employment tax, on the purported grounds that Mr. Thoma was a self-employed individual. See id.

B.    Underpayment of tax for 2011

The IRS has met its burden of showing that the underpayment of tax for 2011 is attributable to a substantial understatement of income tax. See Avrahami v. Commissioner, 149 T.C. 144, 204 (2017) ("The Commissioner has the initial burden of production to show that the understatement of income tax was

[*99] substantial." (citing section 7491(c)).  The notice of deficiency determined

that the 2011 understatement of tax is equal to $14,660, which is $57,655 (the

correct amount of tax determined by the notice) minus $42,995 (the tax reported

on the 2011 return).  The understatement for 2011, $14,660, exceeds $5,000 and

10% of the correct amount of tax (10% of $57,655, or $5,766).  Mr. and Ms.

Thoma's understatement of tax for 2011 is thus substantial.  See sec.

6662(d)(1)(A).  Consequently, we do not discuss whether the underpayment of tax

for 2011 is attributable to negligence.

### C. Reasonable cause

Once the IRS has met its burden of producing evidence that a taxpayer is

liable for a penalty, the taxpayer bears the burden of proving that the penalty is

inappropriate because, for example, the taxpayer acted with reasonable cause and

in good faith.  Sec. 6664(c)(1); Higbee v. Commissioner, 116 T.C. at 447.  The

existence of reasonable cause and good faith is determined on a case-by-case

basis, taking into account all pertinent facts and circumstances.  Sec. 1.6664-

4(b)(1), Income Tax Regs.  Generally, the most important factor is the extent of

the taxpayer's effort to assess the proper tax liability.  Id.  Circumstances that may

indicate reasonable cause and good faith include an honest misunderstanding of

**[*100]** fact or law that is reasonable in the light of all the facts and circumstances, including the experience, knowledge, and education of the taxpayer. Id.

       1.     Treatment of Mr. Thoma as a partner of Thoma & Hjerpe

Mr. and Ms. Thoma argue on brief that they relied on the Schedules K-1 in reporting on the 2010 and 2011 returns that Mr. Thoma was a self-employed individual and partner of Thoma & Hjerpe. The IRS contends that the evidence in the trial record does not support a finding that Mr. and Ms. Thoma relied on the Schedules K-1. We agree with the IRS about reliance. At trial, when counsel for the IRS asked Mr. Thoma questions about the information shown on the Schedules K-1, Mr. Thoma's response consisted of his acknowledgment that counsel for the IRS correctly read the information shown on the forms. For example, counsel for the IRS pointed out that the 2010 Schedule K-1 reported nothing in box 1, "Ordinary business income (loss)", and Mr. Thoma responded: "That's correct." Mr. Thoma did not testify that he relied on the Schedules K-1 when he prepared the returns at issue.

Even if Mr. Thoma had relied on the Schedules K-1 in preparing the 2010 and 2011 returns, his reliance would not be reasonable. A taxpayer may not rely on the information on an information return (e.g., a Schedule K-1) if the taxpayer knows, or has reason to know, that the information is incorrect. Sec. 1.6664-

**[\*101]** 4(b)(1), Income Tax Regs.  Generally, a taxpayer knows, or has reason to know, that the information on an information return is incorrect if the information is inconsistent with the taxpayer's knowledge of the transaction, including, for example, the taxpayer's knowledge of the terms of his employment relationship. Id.  We find that Mr. Thoma had reason to know that the information reported on the Schedules K-1 was incorrect.  As an accountant with years of experience, Mr. Thoma had reason to know it was inconsistent to treat himself as a partner in an entity in which he had no ownership interest, no liability for the entity's debts, and no right to its profits.  We also find that Mr. and Ms. Thoma did not act in good faith when they reported that Mr. Thoma was a partner.  In Mr. Thoma's complaint that his termination from Thoma & Hjerpe was illegal, see supra p. 38, he alleged he was "employed" by Thoma & Hjerpe "for several years prior and up to November 21, 2011".  Mr. Thoma's statement in the complaint that he was an employee of Thoma & Hjerpe "for several years prior to November 21, 2011" indicates that Mr. Thoma considered himself an employee of Thoma & Hjerpe in 2010 and 2011--the years before us.  Further, in Mr. Thoma's claim for unemployment benefits (filed in early 2012 and before the filing of the 2011 return) he took the position that he was employed, and eventually fired, by Thoma & Hjerpe.  These two instances of Mr. Thoma representing that he was an

[*102] employee of Thoma & Hjerpe in nontax contexts where being an employee was favorable to him undermine Mr. and Ms. Thoma's argument in their briefs that they acted in good faith when they reported that he was a partner. Mr. and Ms. Thoma have not carried their burden of showing reasonable cause and good faith with respect to the portions of the underpayments of tax for 2010 and 2011 that are attributable to their position that Mr. Thoma was a partner. Consequently, we find that they did not have reasonable cause or act in good faith with respect to the portions of the underpayments of tax for 2010 and 2011 attributable to the business expenses, health insurance expenses, SIMPLE IRA contributions, and one-half of self-employment tax deductions.

### 2. Mr. Thoma's unsubstantiated business expenses

Mr. and Ms. Thoma argue on brief that they deducted only business expenses of Mr. Thoma's that were "properly and fully substantiated to the IRS." But we concluded supra part II.B, pp. 83-87, that they did not substantiate all the business expenses reported on the returns. Nothing in the record shows that Mr. Thoma took reasonable steps to comply with recordkeeping requirements. Mr. and Ms. Thoma have not carried their burden of showing reasonable cause and good faith with respect to the portions of the underpayments of tax for 2010 and 2011 attributable to the partially unsubstantiated business expenses.

[*103]     3.     Gross profit percentage of 84.34% for 2011

Mr. and Ms. Thoma argue on brief that they "properly reported [the] interest and capital gains from * * * [Mr. Thoma's] sale * * * based on the facts at that time" and that Mr. Thoma "thoroughly researched the tax law with respect to the handling of the catastrophic event affecting * * * [his] contract". Their briefs point to Exhibit 28-P, a treatise on contingent payment sales, in support of their claim that they took reasonable steps in reporting the 2011 installment payments with a gross profit percentage of 84.34%. The treatise identified was not admitted into evidence. Mr. and Ms. Thoma do not convince us that Mr. Thoma relied on Exhibit 28-P when he prepared the 2011 return.[35] Even if Mr. Thoma relied on Exhibit 28-P, Mr. and Ms. Thoma have not shown that his reliance was reasonable. They offered no evidence to show that Mr. Thoma took reasonable steps to determine that the treatise applied to the installment sale. Mr. and Ms.

---

[35]Mr. Thoma used the modified table to prepare the 2011 return, including the 2011 Form 6252, "Installment Sale Income". See supra pp. 49-51. At trial, Mr. Thoma testified that his "calculations [the modified table] were all based on document 28 [i.e., Exhibit 28-P]". This testimony suggests that Mr. Thoma created the modified table after he read Exhibit 28-P. However, Mr. Thoma also testified that he "re-ran an amortization schedule [i.e., the modified table] based on what I was paid". This testimony suggests that Mr. Thoma did not rely on Exhibit 28-P in reporting the 2011 installment payments. We find that Mr. Thoma's testimony is unclear as to whether he created the modified table after reading Exhibit 28-P, or prepared the modified table, filed the 2011 return, and read Exhibit 28-P after the filing of the return.

**[*104]** Thoma have not carried their burden of showing reasonable cause and good faith with respect to the portion of the underpayment of tax for 2011 attributable to the installment sale income reporting.

We hold that Mr. and Ms. Thoma are liable for accuracy-related penalties under section 6662(a) on the underpayments of tax for 2010 and 2011.

To reflect the foregoing,

<u>Decision will be entered for</u>

<u>respondent</u>.